———o◄❀►o———

THE NORWICH GAS LIGHT COMPANY *vs.* THE NORWICH CITY GAS COMPANY.

The common council of the city of N. passed a resolution granting to T. and his assigns, for the period of fifteen years, the right to lay gas-pipes in the streets of said city, declaring therein that no other person or corporation should by the consent of such common council lay gas-pipes in said streets during that time. Held, that such resolution licensed T. and his assigns to use said streets in the manner specified in the resolution, but not to restrain others from a similar use, which did not interfere with their works

Where the plaintiffs, who were incorporated for the purpose of supplying said city of N., with gas, and authorized in their charter to purchase of T. all his gas-works and gas-business in said city and to lay down gas-pipes in the public streets and grounds of said city, purchased of T. all his said works and business; it was held, that their right to use said streets for those purposes was not exclusive.

Where an amendment of the plaintiffs' charter provided, that said right to lay down gas-pipes in and through the streets and public grounds of said city, should be exclusive as against any and all other persons and corporations except such persons or corporations as might thereafter be invested by the general assembly of the state with power to use said streets for the same purpose; it was held, that so far as such amendment was a restriction upon the free manufacture and sale of gas, it was a monopoly, and was unconstitutional and void.

---

The Norwich Gas Light Company *v.* The Norwich City Gas Company.

---

Where subsequently to such charter T. assigned to the plaintiffs all his gas-works and business, and after said charter was amended as aforesaid, another gas company, organized under the statute relating to joint stock corporations, commenced opening the streets of said city of N. to lay down their pipes; it was held, that the plaintiffs were not entitled to an injunction to restrain such new company from continuing their works.

Where such plaintiffs, during their controversy with the defendants, and for the purpose of preventing the latter from laying their pipes from their gas-works into said city of N., purchased a lot of land so situated upon the highway that it was necessary that the defendants' main pipe should pass through it, and the defendants laid their gas-pipes across that part of said lot which lay within the limits of the public highway, and avowed their determination to maintain it there; it was held, that as the substantial controversy between the parties was in relation to their rights to use the highways irrespective of any title to the soil, and as the defendants were liable to the plaintiffs in an action of trespass for any damage the former might do to their land, said injunction ought not to be granted for that reason.

THIS was a bill in chancery brought by the Norwich Gas Light Company for an injunction against the Norwich City Gas Company. The injunction asked was, "to order and decree that the said Norwich City Gas Company refrain from all further distribution of gas through said streets &c., in said city and town of Norwich, and from all further use of said streets, &c., for that purpose, under some suitable penalty."

At the term of the superior court held in November, 1855, the court found the following facts, and reserved the questions arising in the case for the advice of this court.

In the year 1848, Frederick W. Treadway commenced the erection of works for the manufacture of oil gas from oil, and completed them in 1849.

In May, 1851, upon the application of said Treadway, in which a large number of the influential inhabitants of said city united, the common council of said city passed the following resolutions:

"*Resolved,* That liberty be and is hereby granted to Frederick W. Treadway, and his assigns, to lay gas pipes and to erect gas-posts, burners and reflectors in the streets of this city and to do all things necessary to light said streets, and the dwellings, stores, and other places situated therein; *Provided,* that the said streets and the trees growing therein

shall not be injured, but shall be left, and remain in as good and perfect condition as before the laying of said pipes, or the erection of said posts. And provided further, that for any injury to individuals that may arise from the laying of said pipes or from the repairing or using the same, the said Treadway or his assigns, shall be liable in the same manner as if this resolution had not been passed.

"*Resolved*, That the preceding resolution and the privileges thereby granted, shall continue and be in force, and may be enjoyed by the said Treadway and his assigns, for the period of fifteen years; and during that time, no other person, persons, or corporation, shall, by the consent of the court of common council, lay gas-pipes in said streets; *Provided*, That the said Treadway, or his assigns, shall, during the period aforesaid, furnish for the use of the city when required, and of such citizens residing on the streets through which gas-pipes are laid, as may want the same, good coal or other gas, at a price as cheap as gas of like description and quality shall be furnished in other cities of the class to which Norwich belongs, not exceeding four dollars per thousand feet, and on failure to do so, the privileges hereby granted shall cease, and these resolutions be without force."

In the year 1853, Treadway purchased a new site without the city, and commenced the erection of new and more extensive works. For the purpose of acquiring more capital, and obtaining other powers, and in connection with other persons, in the spring of 1854 he and others with him made application to the legislature of the state for a charter of incorporation.

About the same time another and independent petition for the incorporation of another and a different company, but for the same purpose, was preferred to the same General Assembly, by Leonard Ballou and others.

The assembly negatived the petition preferred by Ballou and others, and granted the prayer of the petition of Treadway and others, and incorporated the petitioners under the name of the Norwich Gas Light Company, in an act, the material part of which is as follows:

" SEC. 2. Said company is hereby authorized and empowered to purchase of Frederick W. Treadway his gas-works and gas-business in the city of Norwich, with all the pipes, machinery, land, and buildings connected therewith, and when they have so purchased, are hereby authorized and empowered to manufacture, make, and sell gas, and to use for that purpose, rosin, coal, oil, or any other material or materials, and to furnish such quantities of gas as may be required in the city and town of Norwich, for lighting streets, stores, buildings, or other purposes, and to enter into and execute contracts, agreements or covenants in relation to the objects of said company, and to enforce the same.

" And said company shall be capable of purchasing, taking and holding, and of granting, selling and conveying any estate, real or personal, necessary to give effect to the specified purposes of this company, and for the accommodation of their business and concerns, and to lay down their gas-pipes and to erect gas-posts, burners and reflectors in the streets, alleys, lanes, avenues, or public grounds of said city and town of Norwich, and to do all things necessary to light said city and town of Norwich, and the stores, dwellings and other places situated therein, *provided*, that said gas-pipes shall be laid down and tested before being covered, in the same manner in which similar pipes are now laid down and tested by the New Haven Gas Light Company, and under the superintendence and to the satisfaction of the Mayor of the city of Norwich, and that said streets, cross and side walks, public grounds and public avenues, and the trees of said city, shall not be injured, but all be left in as good and perfect condition as before the laying of said pipes, or the erection of said posts."

This company accordingly purchased of Treadway all his gas property and gas-works, and also whatever rights and interests he had by virtue of the resolves of the common council of the city of Norwich, and said property became vested, so far as it was by law capable of being transferred and vested, in the plaintiffs; who performed all the requirements of their charter, and of the resolutions of the

common council, and expended large sums of money in completing their works, and extending their pipes through the city and town of Norwich; and were able and willing to supply all the gas required by the inhabitants of said city and town.

On the fourteenth day of July, 1854, Leonard Ballou and several other signers of the independent petition preferred to the assembly as aforesaid, with others, including also Chapin, Treadwell & Co., of Springfield, Massachusetts, organized themselves into a joint stock company, pursuant to the statute laws of this State, in and by articles of association, and became a corporation, which corporation is the defendant in this case.

Before said petitions were preferred to the general assembly, the common council passed certain resolutions revoking, or attempting to revoke, the privileges they had granted to Treadway, for the alleged reason that such privileges had been forfeited. But it was not proved that any inquiry or hearing upon the subject was had, or that Treadway was notified of any; and such resolutions, therefore, were not received as evidence of any such forfeiture.

On the 14th day of September, 1854, said Norwich City Gas Company made a contract in writing with Chapin, Treadwell & Co., who therein contracted, for the sum of sixty thousand dollars, to erect suitable works for the manufacture and distribution of gas through said city of Norwich.

On the 25th day of September, 1854, the plaintiffs brought their bill to the superior court for the county of New London, praying for an injunction to restrain said Norwich City Gas Company, from interfering with the rights enjoyed by the plaintiffs under their charter, and the aforesaid resolutions of the common council of Norwich, and upon said bill obtained a temporary injunction, which was duly served on the said Norwich City Gas Company; said bill was duly returned to said superior court, and was there fully heard and upon such hearing dismissed.

After the dismissal of said bill the Norwich City Gas

Company proceeded to erect their works, and lay their pipes pursuant to the object of their organization.

On the 20th day of April, 1854, the plaintiffs, by their agent, purchased of one Frink, a lot of land, fronting about forty feet on Main street in said city, and extending to the centre of the street, and had actual possession of it thereafter, subject to the easement of the public for a highway. It was important to the defendants that their main pipe should pass in the highway over this land into the city, and the plaintiffs, knowing this, purchased the property for the purpose of preventing the defendants from laying their pipes upon said land, and thus of preventing them from laying their pipes in the city.

On the 26th day of February, 1855, the Norwich City Gas Company preferred their petition to the common council of the city of Norwich, praying a grant of the privilege of laying down their gas pipes in the streets and public places of said city, which, on the 20th day of March, was granted.

On the 21st day of April, next following, the Norwich City Gas Company, also brought their petition to the general assembly, then next to be holden at Hartford, praying said assembly to confer upon them the right to lay down pipes in the streets of said city of Norwich, for the distribution of their gas, which was duly served upon the city and town of Norwich, and returned to said assembly. And on the same day the plaintiffs preferred their petition to said assembly, praying for an amendment of their charter, which was duly served upon said Norwich City Gas Company, and returned to said assembly.

During the pendency of these petitions before the assembly, and with full knowledge of all the aforesaid facts, the defendants entered upon part of the land so owned by the plaintiffs and laid their pipes in the same, and from thence continued and avowed their intention to continue to keep and maintain the same in said land. All which was done, against the prohibition and without the consent of the plaintiffs.

The several petitions preferred to the general assembly

in May, 1855, were duly heard, and the assembly denied the prayer of the petition of the respondents, but granted the prayer of the petition of the petitioners, and passed a resolve, amending their charter, which amendment was afterwards, on the 23d day of June, 1855, duly accepted by the stockholders of the Norwich Gas Light Company, and then became a part of their charter of incorporation.

The second section of such amended charter was as follows:

" Sec. 2.   The right of the Norwich Gas Light Company to lay down gas-pipes, and to erect gas-posts, burners, and reflectors, in and through the streets, alleys, lanes, avenues, and public grounds of the city and town of Norwich, and to distribute gas through the same for the purpose of lighting said streets, lanes, alleys, avenues or public grounds, and the stores, dwellings, and other buildings situated thereon, is, and is hereby declared to be exclusive, as against any and all persons or corporations, except such persons or corporations as may hereafter be invested by the general assembly of this State, with power to use said streets, lanes, alleys, avenues and public grounds for the same purpose. *Provided*, that nothing in this act contained, shall prevent any individual, corporation, or society from making or using gas on their own premises, and that the price of gas manufactured by said Norwich Gas Light Company shall at no time exceed four dollars per thousand cubic feet."

The defendants continued to lay their pipes in said land, but the court did not find that any great injury to the land or the enjoyment of the same by the plaintiffs, resulted from said pipes, the same being beneath the ground and without leakage.

And the court further found that the business of the plaintiffs would have been profitable and remunerative if it had not been interfered with by the competition of the defendants, but that it had ceased to be so.   The defendants had laid about 22,000 feet of pipe, a large proportion of it in the streets where the pipes of the plaintiffs were laid, and sold a considerable quantity of gas, and seriously injured and

would continue to injure seriously the business of the plaintiffs, and to depreciate the value of their property in said business. A portion of said pipe was laid and a portion of the customers of the defendants obtained gas of them since the passage of said resolve amending the charter of the plaintiffs, and the defendants, with a full knowledge of all the facts aforesaid, have persisted in disregarding the same.

The question whether any and what relief should be granted in the case, and all questions arising therein were reserved for the advice of this court.

*Mc Curdy*, *Wait*, and *E. Perkins* for the plaintiffs.

*Halsey* for the defendants.

To entitle the plaintiffs to the relief they seek by injunction, they must show an injury to their rights in the character of an incorporated company.

Their claim is based—1st. Upon their having an *exclusive* right to light the city and town of Norwich with gas. And 2d. Upon their equitable ownership of the Frink lot on Main street.

Have they an exclusive right? If so, it is derived from their original charter, or by the license to Treadway from the common council, or by both conjointly; or by the amended charter in connection with the foregoing.

1st. The original charter itself conferred no such right. The principal object of the charter was to enable the plaintiffs, in a corporate capacity, to manufacture and sell gas; and as incidental to that, to use the streets for distributing it.

There is no such exclusive right expressly given, nor is it necessary that they should have such right in order to exercise the power expressly granted, and therefore there is no ground for any implication of a grant of such exclusive powers. The exclusive right is claimed in the incident, and that by implication, while it is not contended that there is any in the principal,—the right to manufacture and sell gas. The case of the *Charles River Bridge* v. *The Warren Bridge*, 11 Pet., 420. (12 Curtis Ed., 496,) is conclusive against

the plaintiffs, as to the rule of construction. That was a case of governmental prerogative. This is a mere grant to trans- act ordinary business in a corporate capacity. Therefore the construction should be more strict. This is a grant wholly of *benefits*. *The Attorney General* v. *The Sheffield Gas Consumers' Company*, 19 Eng. L. & E., 639. (S. C. in Gas Journal, vol. 3, p. 31, 32, 60.) *Chartered Gas Company* v. *The Central Gas Company*, Gas Journal, vol. 1, 322. The plaintiffs liken their charter to bridge and ferry charters, but there is no analogy. " Bridges and ferries are a com- mon charge for the benefit of all the citizens, and are there- fore provided for by, and are under the control of, the govern- ment." 17 Conn. R., 64. It may well be doubted, if the point were now before the court, whether any such implied con- struction would be given to such charters. 18 Conn. R., 451.

2d. The resolution of the court of common council of August 4th, 1851, conferred on Treadway no exclusive right. That court had no power to make any such grant. The utmost that it amounted to was a license to use the streets, and to protect him from prosecution under the city by-laws, or on behalf of the state.

The whole powers of the common council were derived from the city charter, which embraces the following provis- ions. " There shall be a court of common council, who shall have power to make by-laws " (among other things,) " rela- tive to the streets and highways of said city,"—"relative to public lights and lamps," and " power to lay out streets, &c., &c." Whatever powers they have, are derived from these sections, and are of a limited nature, and to be strictly con- strued. *City of New London* v. *Brainard*, 22 Conn. R., 552. *Hodge* v. *City of Buffalo*, 2 Denio, 110.

They have power, also, to make by-laws. Where a particular mode is pointed out, that mode is to be pursued. But here is no by-law.

The resolution is also void as creating a monopoly. A by-law which makes a monopoly is void. Jacob's Dict., Monopoly.

3d. There is no exclusive right acquired by virtue of the

purchase from Treadway. The legislature did not intend to confer any new power upon the court of common council, or to validate their action; but simply to authorize the company to purchase of Treadway. They took by assignment only what rights he had. *Charles River Bridge* v. *The Warren Bridge*, 11 Pet., 420.

4th. The amended charter is ineffectual to confer upon the plaintiffs an exclusive right, because, 1st, if it has the effect which the plaintiffs claim, it is an attempt of the legislature to construe their own grant,—to exercise judicial functions.

The legislative and judicial powers are separated by our constitution. Art. 2.

A legislature cannot authoritatively declare what the law is, or has been, but only what it shall be. *Ogden* v. *Blackledge*, 2 Cranch, 272, (1 Curtis' Ed., 490.) *Dash* v. *Van Kleek*, 7 John., 478. *The Governor* v. *Porter*, 5 Humph., 165, (4 U. S. D., 405.) *Chestnut* v. *Shane*, 16 Ohio, 599, (8 U. S. D., 71.) *Houston* v. *Bogle*, 10 Iredell, 496, (11 U. S. D., 971.) *McLeod* v. *Bourroughs*, 9 Geo., 213, (12 U. S. D., 120.) 1 Kent's Com., 456, Notes. 2d. Because it creates a monopoly, contrary to common right and natural justice, and to the spirit and intent of the constitution of this state. That it creates a monopoly, 4 Black., 159. Ba. Abr., monopoly, A. Bouvier's Dict., monopoly. Jacob's Dict., monopoly.

It is against common right and natural justice, and therefore cannot be granted by the legislature, independently of the constitution. *De Bonham's Case*, 8 Co., 114. *Calder* v. *Bull*, 3 Dallas, 386. *Bank of Columbia* v. *Okely*, 4 Wheat., 244, (4 Curtis' Ed., 390.) *Varick* v. *Smith*, 5 Paige, 127. *Taylor* v. *Porter*, 4 Hill, 140. *Mather* v. *Chapman*, 6 Conn. R., 58. *Bradshaw* v. *Rogers*, 20 John., 109. The principle was judicially declared in *Ham* v. *McClaws*, 1 Bay, 98, and *Bowman* v. *Middleton*, 1 Bay, 252. 1 Kent, 451. The same principle was laid down in *Rice* v. *Foster*, 5 Harring., 479, (10 U. S. D., 100.)

It is in violation of the letter and spirit of the constitution of this state. Declaration of rights, Art. 1st.

5th. The facts found as to the lot on Main street, do not entitle the plaintiffs to an injunction. A mere trespass is never a ground for an injunction. There must be irreparable injury, or danger of it. *Attorney General* v. *The Sheffield Gas Consumers' Company*, 19 Eng. L. & E., 639.

HINMAN, J. The plaintiffs are a corporation under a charter granted by the general assembly, and the defendants are also a corporation, organized under the provisions of the statute in relation to joint stock corporations. Both companies are engaged in the business of making and supplying the city and town of Norwich and the inhabitants thereof with gas. The plaintiffs, under a grant or license to Frederick W. Treadway, the interest in which they have acquired by assignment from Treadway, and under their original act of incorporation and an amendment thereto, passed in 1855, claim the exclusive right to use the streets and public grounds of the city for the purpose of laying down gas-pipes and erecting gas-posts and burners therein.

The court of common council of the city of Norwich, on the 4th of August, 1851, passed a resolution which purports to grant to Treadway and his heirs and assigns the right to lay gas-pipes and erect gas-posts, &c., in the streets of the city, and it declares that the privileges thereby granted shall continue and be in full force, and may be enjoyed by said Treadway, and his assigns, for the period of fifteen years; and that during that time no other person, persons, or corporation shall, by the consent of the court of common council, lay gas-pipes in said streets.

The original act of incorporation gives the plaintiffs, among other things, authority to purchase of said Treadway his gas-works and gas-business, in the city of Norwich, with all the pipes, machinery, land and buildings connected therewith, and to manufacture and sell gas, and to furnish such quantities thereof as may be required, for lighting the streets and buildings, and for other purposes. It also gives them the right to lay down their gas-pipes, and to erect gas-posts, burners and reflectors in the streets and public grounds of

the city and town of Norwich, and to do all things necessary to light the said city and town of Norwich, and the stores, dwellings, and other places situated therein; and by the amendment to the charter, it is declared that this right is, and is hereby declared to be exclusive, as against any and all corporations, except such persons or corporations as may thereafter be invested by the general assembly of the state with power to use said streets and public grounds for the same purpose. The amendment also provides, that it shall not be construed to prevent any person or corporation from making gas on their own premises; and that the price of gas, manufactured by the plaintiffs, shall not exceed four dollars per thousand cubic feet.

The defendants have obtained no grant or authority from the general assembly to lay their gas-pipes in the streets or public places of the city or town; but, on their application to the court of common council of the city, that body, on the 26th of March, 1855, without any notice to the plaintiffs, and without revoking, or otherwise noticing its former grant to the plaintiffs, granted the defendants the privilege of laying their gas-pipes &c., in the streets and public places of the city, on certain terms, upon which no question arises.

Upon these facts the question is, whether the plaintiffs have such an exclusive right to the use of the streets and public places in the city of Norwich, for the purpose of laying gas-pipes, and distributing gas therein, as to be entitled to an injunction against the defendants, who are engaged in the same business, and are using the streets for the same purpose.

In the determination of this question, the court will not undertake to define the rights or powers of cities, or other municipal corporations, or of individuals, to make use of the public streets, for the purpose of laying gas-pipes therein, or for other similar purposes, any further than it may become necessary, in order to determine the questions which are involved in the case. The right of the plaintiffs to an injunction, does not depend upon the question whether the defendants have the right to use the streets in the manner

they are using them, in order to distribute their gas; but upon whether the plaintiffs have such an exclusive right to use them, that they can call upon the court to protect them in this right, by injunction. The plaintiffs' case must stand upon the strength of their own title, and not upon any defect in that of the defendants; and it is obvious that if the plaintiffs have the exclusive right which they claim, they must have acquired it, either as the assignees of Treadway, under the resolution of the court of common council, of the 4th of August, 1851; or under the original charter to them, granted in 1854; or under the amendment to the charter, passed in 1855.

The plaintiffs however are the equitable owners of what is called the Frink lot, and if they have no exclusive right to the use of the streets, under any of these grants, then there will remain only the question, whether they are entitled to enjoin the defendants against laying their pipes in the street, in front of this lot.

1. Have the plaintiffs an exclusive right to the use of the streets as the assignees of Treadway?

The resolution under which this right is claimed, purports to grant to Treadway and his assigns, for the period of fifteen years, the right to lay gas-pipes in the streets; and it declares that no other person or corporation shall, by consent of the common council, lay gas-pipes in said streets during that time. But the city does not own the streets. They are public highways, like any of the ordinary roads in the state; and although, by the city charter, they may be subject to certain regulations respecting police, side-walks, drainage, and repairs, yet the city, as such, has no interest in the soil. This belongs to the adjoining proprietors, or to other individuals, as in the case of other highways. *Nicholson* v. *N. H. & N. Y. R. R. Co.*, 22 Conn. R., 74. And the right of way over them, being public to all who may have occasion to use them, and the only power of the city over them being given by their charter in order to regulate such use, it seems clear that the city can make no grant which shall convey to the grantee any interest in them, which can,

in any proper sense, be deemed property. Besides, if the resolution of the court of common council be viewed in the light of a grant of an interest in the soil, it should have been perfected by a deed. No title, as such, can be transferred by a mere vote of a corporation, which will enable any one to hold any permanent interest in real estate.

But if the whole effect of the resolution be merely to license Treadway and his assigns to use the streets, so as to protect them from a prosecution for a public nuisance for digging them up in order to lay down their pipes, it is obvious that it could only operate to protect themselves; and would give them no title by which they would be authorized to restrain the defendants from similar acts, provided those acts did not interfere with the works of the plaintiffs. We think, therefore, the plaintiffs can derive no aid from this act of the authorities of Norwich, in this application.

2. If no exclusive right to the use of the streets was acquired under the resolution of the court of common council, the next question is, whether any such right was acquired, under the plaintiffs' original charter, either by itself alone, or in connexion with their assignment from Treadway?

The only part of the original charter which can have any bearing upon this question, is the second section. That authorizes the corporation to purchase of Treadway his gas-works and gas-business, with all the pipes, machinery, land, &c., connected therewith, and to make and sell gas, and furnish such quantities of gas as may be required for lighting streets, stores, and other purposes, and to make and enforce contracts in relation thereto, to purchase real and personal estate for the accommodation of their business, and to lay down their gas-pipes, and erect gas-posts, burners, &c., in the streets and public grounds of the city and town of Norwich, and to do all things necessary to light the city and town, and the buildings therein. This is the substance of all there is in the charter on the subject; and we discover nothing in it which can fairly be said to raise a plausible argument in the plaintiffs' favor. So far as any exclusive right to any of these privileges is concerned, we do not see

how the plaintiffs' case can be made to differ from the chartered powers of any trading corporation. In regard to the use of the streets, it might operate to protect them from a prosecution, on the part of the public, for breaking them up. But in other respects, how do they stand on any different ground from an incorporated transportation company, with the right to use the highways with their carriages, or the public waters with their boats? And could it aid such a corporation, in a claim to an exclusive right to use the public highways, that it was also authorized to purchase the effects of some person who had formerly been engaged in the same business? There is nothing that makes it necessary that the plaintiffs' rights should be exclusive. Two or more companies may consistently use the same streets, for the purpose of laying down their pipes. Without resorting, therefore, to the rule that public grants are, in some cases, to be construed most beneficially for the public, and against the grantees, we feel no hesitation in saying, that the legislature did not intend in the original charter to grant to the plaintiffs any exclusive right to use the streets for the purpose of distributing gas.

3. Have the plaintiffs the exclusive right which they claim under the amendment to their charter, passed in 1855?

The second section of the amendment provides that " The right of the Norwich Gas Light Company to lay down gas-pipes, and to erect gas-posts, burners and reflectors, in and through the streets, alleys, lanes, avenues, and public grounds of the city and town of Norwich, and to distribute gas through the same for the purposes of lighting said streets, lanes, alleys, avenues or public grounds, and the stores, dwellings, and other buildings situated thereon, is, and is hereby declared to be exclusive, as against any and all persons or corporations, except such persons or corporations as may hereafter be invested by the general assembly of this state, with power to use said streets, lanes, alleys, avenues, and public grounds, for the same purpose. *Provided,* that nothing in this act contained, shall prevent any individual, corporation, or society from making or using gas

on their own premises, and that the price of gas manufactured by said Norwich Gas Light Company shall at no time exceed four dollars per thousand cubic feet."

The defendants do not claim to have procured from the general assembly any authority to use the streets, &c., of the city for the distribution of their gas, and thus to have brought themselves within the exception contained in this section; and we are thus brought directly to consider, what additional privileges were conferred upon the plaintiffs, by this amendment of their charter. And it cannot be denied that the expressed intention of the section is to make the right of the plaintiffs to use the streets exclusive, for the purpose of distributing gas to light the streets, and buildings situated thereon. The question here, then, must be, whether this provision is one which the legislature could lawfully make, in the form in which it is here attempted to be made? And however reluctant the court may feel, to be obliged to pass upon a question of this sort, yet, as it cannot be avoided without an entire disregard of duty, the question must be disposed of like any other which it becomes necessary to determine, though with all due respect to the legislative power of the state.

This provision must, we think, be taken either to be intended as a declaration and enactment, that the laying of gas-pipes in the streets of the city, for the purpose of distributing gas therein, to light the streets and buildings, should be a public nuisance in all other persons, except the plaintiffs; or to be intended as a grant to the plaintiffs of an exclusive property franchise in the streets, consisting in the right to use them for this purpose. The plaintiffs claim it in both these aspects; and they are necessarily driven thus to make their claim, because, if it be viewed as a mere enactment that the laying of gas-pipes in the streets by any persons other than the plaintiffs shall be unlawful, and amount to a public nuisance, without granting any exclusive right to the plaintiffs to do such acts—that is to say, without granting them some legal interest in the use of the streets for this purpose other than such as would result from a mere

license to do acts which would amount to a nuisance in other persons, then it would seem to follow from the decisions, that the plaintiffs would have no such interest in the acts of the defendants, as would enable them to apply for an injunction. A mere license to the plaintiffs to distribute gas in a mode which is a public nuisance in other persons, gives them no interest in the street, and they can only sustain their bill upon the idea that they have an interest there which has been, or is threatened to be interfered with. The fact that the parties are competitors for the custom of the city, and its inhabitants, for the sale of gas which they manufacture, can give the plaintiffs no right to interfere in the defendants' business, for the purpose of rendering the distribution of their gas so inconvenient as practically to prevent their doing it, and thus of securing to themselves a monopoly of the business. The manufacturing of gas for the purpose of lighting buildings is a lawful business, which the plaintiffs obviously have no lawful right to interfere with, by throwing obstructions in the way of its distribution. On the contrary, the policy of the law is to encourage trade, by the free competition of all who may choose to engage in it, and it cannot recognize a right in the plaintiffs to interfere for the purpose of preventing a public nuisance, on the ground of an interest they have, as competitors with the defendants, for the public patronage in this business.

If the defendants were engaged in an extensive tannery, so located as to be a public nuisance, could the owners of a rival establishment found a right to interfere on behalf of the public and themselves, merely on the ground that their business was less profitable than it would be, if there were no competitors in the market? We presume no one would seriously make such a claim, yet we see no distinction in principle in the cases. In this aspect, then, the plaintiffs must be considered in the light of a person having no other interest in the subject matter than such as is common to the whole public, attempting by the process of injunction, on his application alone, to restrain the defendants from the commission of a public nuisance. This, it is well settled,

cannot be done. *Bigelow* v. *Hartford Br. Co.*, 14 Conn R., 565. *O'Brien* v. *Norwich & Worcester R. R. Co.*, 17 Conn. R., 372. *Attorney General* v. *Sheffield Gas Consumers' Co.*, 19 E. L. & Eq. R., 639.

Has then the amendment to the plaintiffs' charter the effect of conferring on them an exclusive property franchise, in the streets and public places in the city of Norwich, for the purpose of laying pipes through which to distribute gas? The plaintiffs insist that it has this effect, and they say it confers on them a franchise similar, in all respects, to the franchise which is sometimes granted to a ferry or bridge corporation, prohibiting any other ferry or bridge within certain specified limits.

A franchise is defined by Blackstone to be a royal privilege or branch of the crown's prerogative, subsisting in the hands of a subject. Being derived from the government, it is always supposed to have been originally granted by the government. It is property which may be transferred by sale or devise, and it will descend to heirs like other property; and the owner has the same security for its protection under the constitution, as has the owner of any other property. *Enfield Toll Br. Co.* v. *Hartford & N. Haven R. R. Co.*, 17 Conn. R., 40.

As this is a species of property derived by grant from the government, it follows, that if the government has no power to make the grant, either because it is contrary to public policy, or because the government had no title to the thing granted, no title will be conveyed to the grantee. This grant appears to have been made without any consideration whatever for it. The plaintiffs are under no obligation to make gas, or to suffer the gas which they may make to be used. They are restricted in the price of what they do sell, but there is no provision that they shall sell to all, or to any who may apply for it, or to so many as they may be able to accommodate. In this respect there is a broad distinction between this and the grant of a bridge or ferry franchise. The most valuable interest in bridge and ferry grants is the right to take toll, and this right is never granted unless it is founded on an adequate consideration, which in the case of

a ferry consists in an obligation to keep boats for the transportation of passengers, &c., and in the case of a bridge in erecting and keeping the bridge in repair, for the accommodation of all who may have occasion to use it. And we are told that the right of the crown to authorize the collection of tolls can not be imposed on the public, unless upon terms of this sort. 2 Steph. Bl. Com., 16. And if the right to tolls can not be granted, except upon the terms of an adequate consideration, in the facilities furnished to the public, ought the public, or any portion of it, to be deprived of the ordinary means of obtaining gas, unless the parties who claim an exclusive right to use those means, are under an obligation to furnish it?

Again, it is the duty as well as the prerogative of the government to provide necessary and convenient roads and bridges; and, to enable it to accomplish this object, it has everywhere what is called "the right of eminent domain;" the right over individual estates to resume them for this and other public purposes. Such a prerogative connected with a corresponding duty, with the power to execute it by the exercise of the right of eminent domain, necessarily implies that it belongs to the government to determine what improvements are of sufficient importance to justify the exercise of the right, and when and how it shall be exercised; and if a particular bridge, or ferry, is considered sufficient for a particular locality, it may stipulate, that within such reasonable limits, the particular bridge or ferry tolls shall not be diminished by any other improvement of the sort. But it is no part of the duty of the government to provide the community with lights in their dwellings, any more than it is to provide them with the dwellings themselves, or any of the necessaries or luxuries which may be deemed important to the comfort or convenience of the community. And if it be assumed that there would be no impropriety in the lighting of the streets under the control and direction of the sovereign power, this would be merely as a regulation of police, or an incident to the duty to provide safe and convenient ways. And in this case, the power to provide for

lighting the streets is of no importance, because nothing was done to secure the object, unless the plaintiffs chose to assume it; and whether they would do so, would probably depend upon whether it could be made profitable. As, then, no consideration whatever, either of a public, or private character, was reserved for the grant; and as the business of manufacturing and selling gas is an ordinary business, like the manufacture of leather, or any other article of trade, in respect to which the government has no exclusive prerogative, we think, that so far as the restriction of other persons than the plaintiffs from using the streets for the purpose of distributing gas by means of pipes, can fairly be viewed as intended to operate as a restriction upon its free manufacture and sale, it comes directly within the definition and description of a monopoly; and although we have no direct constitutional provision against a monopoly, yet the whole theory of a free government is opposed to such grants, and it does not require even the aid which may be derived from the Bill of rights, the first section of which declares "that no man or set of men, are entitled to exclusive public emoluments, or privileges from the community," to render them void. The statute of 21 James I., C. 3, which declares such monopolies to be contrary to law and void, except as to patents for a limited time, and printing, the regulation of which was at that time considered as belonging to the king's prerogative, and except also, certain warlike materials and manufactures, the regulation of which for obvious reasons may fairly be said to belong to the king, has always been considered as merely declaratory of the common law. 4 Bacon's Abr., p. 764, Tit., Monopoly. 4 Blk. Com., 160. Hindmarch on Patents, chap. 2, p. 7, *et seq.* A monopoly, in the sense in which this exclusive grant may be said to be such, is defined by Bouvier as "an institution or allowance by a grant from the sovereign power of the state, by commission, letters patent, or otherwise, to any person or corporation by which the exclusive right of buying, selling, making, working or using of any thing is given."

While then we are not called upon to question the au-

thority and power of the legislature to grant to the plaintiffs the right to lay down their own pipes for the distribution of gas through the streets, for their own private purposes, we think, considering that the streets, subject to the public easement, are private property, that it does not possess the power to exclude others from using them for similar purposes. And while we do not question its power to provide that the breaking up of the streets for this or other purposes shall be a public nuisance, we do not think the plaintiffs have such a special interest in the streets as will enable them to ask for an injunction against it. As was remarked in the case against the Sheffield Gas Consumers' Company, above cited, the plaintiffs, having acquired a right to lay their pipes in the streets, are, in truth, seeking through this medium a higher and better right—a right to preclude all others from laying down their pipes. This, we think, they are not entitled to do.

Since this controversy has been pending, the plaintiffs, through the agency of one Caleb B. Rogers, have purchased a lot of land which has been conveyed to said Rogers, but the plaintiffs, being the equitable owners, are in possession. This lot is so situated on the highway that it is important that the defendants' main pipe should pass, in the highway, over a portion of it into the city, which being known to the plaintiffs, they purchased the property for the purpose of preventing the defendants from laying their pipes upon, or in it, and thus to prevent them from laying their pipes into the city ; yet the defendants, without the consent of the plaintiffs, and against their prohibition, have laid their pipes across that part of said lot which is within the limits of the highway and continue to maintain it there, and avow their intention so to continue it.

Upon these facts we do not think the discretionary power of granting or refusing an injunction ought, under the peculiar circumstances of the case, to be exercised in favor of the plaintiffs, on account of their equitable ownership of this lot. The real, substantial controversy between the parties has been in respect to their rights to use the highways,

irrespective of any title to the soil, which either of them might have in respect to any particular portion of them. And although it is important to the defendants to cross this lot with their pipe, yet this has nothing to do with the main controversy in the case, and its importance obviously arises from the present location of the defendants' works. And we do not think that the voluntary purchase of the lot, after the controversy had arisen, as a sort of make-weight in the case, in the hope that it might enable the plaintiffs to secure a bill of costs, irrespective of the rights of the parties upon the real controversy, is entitled, in a court of equity, to any very favorable consideration. The defendants are liable in trespass for any damage that may be done to the land, and the injury at present does not appear to us of that irreparable character that requires the interposition of a court of equity, by way of injunction.

Upon the whole case, therefore, we advise the superior court to dismiss the bill.

In this opinion the other judges, STORRS and ELLSWORTH, concurred.

Bill dismissed.