THE STATE OF KANSAS, *ex rel. A. H. Vance, County Attorney of Shawnee County*, v. THE CITY OF TOPEKA.

1. INTOXICATING LIQUORS—*Cities not to License Sale.* Cities of the state of Kansas have no power to license or authorize the sale of intoxicating liquors.

2. ———— Such power has not been conferred upon cities, but has been withheld from them, and prohibited.

3. QUO WARRANTO *Against Municipal Corporation.* Whenever a municipal corporation usurps any power which might be conferred upon it by the sovereign power of the state, but which has not been so conferred, such corporation may be ousted from the exercise of such power by a civil action in the nature of *quo warranto* in the supreme court.

4. THE PEOPLE—*Prohibitory Power over Intoxicating Liquors.* The sovereign power of the state is inherent in the people, the legislature being a mere instrument of sovereignty; and the people in their sovereign capacity have the power to authorize the sale of intoxicating liquors, or to regulate the same, or to prohibit the same, as they may choose, or to delegate such power to municipal corporations; but the people in this state have withheld such power from municipal corporations, and by their constitution and statutes have prohibited the same.

5. TOPEKA, *Not to Indirectly License Dramshops.* The city of Topeka has not issued or granted any written or printed licenses or permits authorizing the sale of intoxicating liquors, but for the purpose of obtaining revenue has indirectly and evasively authorized and licensed such sales, and has obtained revenue from such sales by imposing taxes or charges, and simulated fines and forfeitures upon the persons making such sales. *Held,* That as such power has not been conferred upon the city, the city may be ousted from the exercise thereof by a civil action in the nature of *quo warranto* in the supreme court.

## Original Proceedings in Quo Warranto.

ACTION brought in the name of *The State* by the county attorney of Shawnee county, to oust *The City of Topeka* from exercising the power of licensing persons to sell intoxicating liquors within the limits of the city, and taxing them for so doing. The facts are stated in *The State, ex rel., v. City of Topeka,* 30 Kas. 653, and in the opinion herein, filed at the February, 1884, session of the court.

*G. C. Clemens,* for The State.

*A. B. Quinton,* and *J. D. McFarland,* for defendant.

The opinion of the court was delivered by

VALENTINE, J.: This is an action in the nature of *quo warranto,* brought by the county attorney of Shawnee county in the name of the state of Kansas, to oust the city of Topeka from exercising the power of licensing persons to sell intoxicating liquors within the city limits, and of imposing license taxes or charges upon such persons for the supposed privileges granted to them by the city. The defendant demurred to the plaintiff's petition upon nearly all the statutory grounds, which demurrer, after a careful consideration by the supreme court, was overruled. (*The State, ex rel., v. City of Topeka,* 30 Kas. 653.) The defendant then answered to the plaintiff's petition, by filing a general denial. The plaintiff then moved for judgment in its favor upon the pleadings, notwithstanding the defendant's answer. This motion was also overruled by the supreme court. A referee was then appointed, by the consent of the parties, to take testimony in the case; and such

The State, *ex rel.*, v. City of Topeka.

testimony was taken. Afterward a trial was had before the court, with the result hereafter stated. But before stating our final decision we shall make a few preliminary observations.

We suppose it will be universally admitted that no city in the state of Kansas has any power to license or authorize the sale of any intoxicating liquor, even for a legitimate purpose, and certainly not for any illegitimate or illegal or prohibited purpose; for no such power is or has been conferred upon any city of the state by any law now in force, and cities can exercise only such powers as have legally been conferred upon them. Indeed, all power to authorize or license the sale of intoxicating liquors has been entirely withheld from cities, and the exercise of such power by cities has been prohibited by the plainest implications. Only probate judges in the state of Kansas have the power at the present time to grant licenses or permits authorizing the sale of intoxicating liquors, and they can grant such licenses or permits only to druggists and manufacturers; and druggists and manufacturers can sell under such licenses or permits only for medical, scientific and mechanical purposes, and then only under certain prescribed rules and regulations fixed by statute. All other sales of intoxicating liquors, and all licenses for any other sales of the same, except such licenses as are issued by probate judges, are absolutely prohibited by law.

We also suppose that whenever a municipal corporation usurps any power which might be conferred upon it by the sovereign power of the state, but which has not been so conferred, such corporation may be ousted from the exercise of such power by a civil action in the nature of *quo warranto* in the supreme court. (Const., art. 3, § 3; Civil Code, § 653, and decisions and statutes cited by counsel for plaintiff in the argument on the demurrer.*) Now the sovereign power of the state of Kansas, as in all governments by the people, is

---

*THE decisions and statutes referred to are embodied in the following quotation from the brief above mentioned:

"The constitution of Kansas was modeled upon that of Ohio; and there, ever since 1838, *quo warranto* has been the remedy 'when any corporation exercised *powers*

inherent in the people. They are the original source and fountain from which emanates all power, civil and political; and the various branches or departments of the government are simply the instruments of sovereignty, and not the sovereignty itself. Even the legislature is a mere instrument of sovereignty, a servant of the sovereign, and not the sovereign itself; and certainly the people in their sovereign capacity have the power to authorize the sale of intoxicating liquors, or to regulate the same, or to prohibit the same, as they may choose; and they have the power to delegate this power to municipal corporations if they should choose to do so. In this state, however, they have wholly withheld such power from municipal corporations. In this state, by the constitution and through the acts of the legislature, the people have utterly prohibited the sale and manufacture of all intoxicating liquors, except for certain purposes; and have utterly withheld from all cities all power to license or authorize the sale of such liquors, for any and every purpose.

The only question then for us to consider in this case is, whether the city of Topeka has attempted to authorize or license the sale of intoxicating liquors. This question is principally a question of fact; and while from the evidence introduced on the trial of the case the real facts seem to be obscured and the solution of the question thereby made difficult, yet we think the evidence will require an answer to be given in the affirmative. A few of the leading facts, as deduced from the evidence, are as follows: On June 15, 1881, an ordinance was passed by the city council of the city of Topeka, and on June 16, 1881, the ordinance was approved by the mayor, which ordinance contains among other provisions the following, to wit:

not conferred by law,' to oust it from the exercise of those powers. (2 Swan & Critchf. St., p. 1265; Swan's St. 1854, p. 784; 11 Ohio, 8-96. See also *The State v. Cincinnati*, 20 Ohio St. 18; *The State v. Cincinnati*, 23 id. 445.) When our constitution was adopted, this same provision had been in force in Pennsylvania since 1837, (Purdon's Dig. 832;) in Wisconsin since 1858, (Rev. St. 1858, p. 917;) in New York since 1849, (L. 1849, p. 699;) in Michigan since 1846, (2 Comp. L. 1871, p. 1962; see p. 1960 for date;) in Massachusetts since 1852, (Gen. St. 1860, p. 744; date in margin, §16;) in Indiana since 1852, (2 G. & H. St., p. 323; see p. 33 for date;) in Iowa since 1851, (Code of Iowa, 1851, p. 298;) and it is now in force in almost every state in the Union. See also 25 Conn. 36; 45 Mo. 20; 95 Ill. 578; 47 Conn. 602; 11 Ohio, 97; 5 Ohio St. 217; 47 Pa. St. 468; 45 Md. 379; 21 Ill. 69; 13 Pet. 595; 5 Wend. 217; 15 Johns. 387; 15 N.T. 170; 27 id. 619; 8 Mod. 114."

" 20. Persons dealing in soda water, seltzer water, German mineral water, and other drinks, shall pay for each and every place where such drinks are sold six hundred dollars per annum: *Provided*, That this shall not apply to peanut venders, confectioners, or drug stores."

Under another provision of this ordinance, the person desiring a license to deal in "soda water, seltzer water, German mineral water, or *other drinks*," was required to pay only one-sixth of the annual license tax at any one time. From the passage of this ordinance up to about September 18, 1882, the sum of $22,000, in round numbers, was collected from the saloon keepers who sold intoxicating liquors in violation of law, and no sum was collected under the above-quoted provision from any other person or class of persons.

On September 18, 1882, the mayor issued a proclamation, ordering that all saloons where intoxicating liquors were sold in violation of law should be closed from and after October 1, 1882; and on September 19, 1882, he made a report to the city council, in which report he used the following, among other language:

"In view of the fact that on the first day of October next we will be deprived of a large revenue from licenses issued to dealers in soda water, etc., it becomes your duty to provide without delay an equivalent income from some source.

"The city has received, in round numbers, some twenty-two thousand dollars ($22,000) within the fifteen months from such licenses. This must be replaced largely in some way, probably by an occupation tax, and the proper committees should be directed to immediately prepare an ordinance looking to that end. You should also direct the city attorney to draft an ordinance providing penalties for violations of what is popularly known as the 'temperance law,' so as to bring this class of cases properly within the jurisdiction of the authorities of the city."

On September 26, 1882, an ordinance was passed by the city council, and on the same day approved by the mayor, which ordinance, in substance, prohibited the sale of intoxicating liquors, and fixed fines and penalties for any violation

thereof as follows: A fine of not less than $100 nor more than $500 for each violation, or a fine of not less than $10 nor more than $50 and imprisonment in the city prison not less than fifteen days nor more than three months, for each violation.

The saloons were closed about October 1, 1882, and remained closed until sometime in November, when they were again opened. And from that time forward there was no honest attempt made on the part of the city authorities to again close them, or to enforce obedience to the ordinance. The whole object of the city authorities from that time forward up to the time when this action was commenced, which was June 26, 1883, seems to have been to permit the saloons to remain open, and to obtain a revenue therefrom. During that time there were over thirty saloons in existence, and in all probability the aggregate violations of the city ordinance by the keepers of these saloons and their assistants amounted daily to hundreds, and possibly to thousands, and amounted during the year to hundreds of thousands, and possibly to millions; and yet only one prosecution for each saloon was usually had during each two months, (six prosecutions during the year,) and this prosecution was not in good faith, but was merely a simulated prosecution. Twenty-two thousand dollars would probably be the price of about two hundred thousand drinks; and to justify the payment of twenty-two thousand dollars would probably require the sale of hundreds of thousands, and possibly millions of drinks; and yet in all there were only a few prosecutions, and they were merely simulated prosecutions, as before stated. These supposed prosecutions were usually conducted in the following manner: The city marshal would usually, about every two months, give notice to each saloon keeper that his fine, or assessment, or tax, or whatever it may be called, was due and must be paid. The saloon keeper would then, as a general rule, appear before the police judge and plead guilty to a violation of the city ordinance, and the police judge would then fine him $100, and he would pay the same and be discharged. The fine was

invariably $100, and no imprisonment was ordered, except as a means of enforcing the payment. of the fine. In many cases, however, the saloon keeper would not appear before the police judge at all, but would simply hand the $100 to the city marshal and the city marshal would then report the same to the police judge, and the police judge would order that the amount be forfeited to the city; and that was considered as ending the case. It was then considered that the saloon keeper was free to. carry on his business again for another two months without further molestation or disturbance. The entire action of the city authorities seemed to be to obtain revenue, and not to enforce the city ordinance, and not to close the saloons. The saloon keepers seem to have paid promptly. Probably $100 every two months was only a small proportion of each saloon keeper's profits, and he could well afford to pay that amount. And even if each saloon keeper committed one hundred violations of the city ordinance each day, or a thousand or a hundred thousand during the two months, yet if he kept what the city authorities considered to be a reputable saloon, he was not to be prosecuted except *once* about every two months, and then only for *one* violation of the city ordinance; and he was then to be fined only $100, and no imprisonment was to be imposed upon him as a punishment, and if he paid the $100 to the city marshal when notice was given to him he was not even to be fined; for money was all that the city authorities seemed to want.

There was still other evidence tending to show that the only object of the city authorities was to obtain revenue, and not to enforce the city ordinance, .and not to prevent the illegal sale of intoxicating liquors; and that for the purpose of obtaining revenue, they virtually authorized and licensed the sale of intoxicating liquors; but we hardly think it necessary to set it forth or to further discuss the case upon the evidence, and for the reason, among others, that at the present time the. only real question to be settled between the parties is a question as to which of the parties shall pay the

costs, and the main question is in no other sense a question upon the merits. There is no claim now that the city is attempting to license or authorize the sale of intoxicating liquors, or even that it connives at any such sale, but the only claim now made on the part of the plaintiff is, that the city was doing these unwarrantable things at the time when this action was commenced, and therefore that the ordinary judgment of ouster should be rendered against it, and that it should be required to pay the costs of this suit.

We have probably already said more than was necessary to say under the circumstances of this case. Probably, however, before closing, we should still set forth, by way of explanation, one or two other facts. The city has not by any written or printed license or permit authorized the sale of any intoxicating liquor, but we think it has just as effectually done so by the action of its officers as though the license or permit had been completely in writing, and authorized by an express provision of a city ordinance. No circuity of action, no indirection or evasion, can possibly excuse the city, or render its illegal and wrongful acts harmless and innocent; and no amount of shifts or subterfuges can ward off the merited consequences of wrong-doing. Courts look to the substance and essence of things, their real natures and characters, and not merely to forms. And looking at the present case in this manner, we think the city, through its officers, has culpably violated the law by usurping privileges and franchises not only not given to it, but expressly withheld from it, and absolutely prohibited. No city has a right to seek revenue or other benefit by the encouragement of illicit business. Indeed, no city has a right to go beyond its own granted powers to encourage even a lawful business. In the present case, the city of Topeka has not only gone beyond its own granted powers to encourage a business, but it has gone beyond its own granted powers to encourage an illegal business. It is also the duty of all officers, city officers as well as others, to support the constitution of the state and to obey the laws, and especially all the laws pertaining to the

duties of their own respective offices. Their oath of office requires this. (Comp. Laws of 1879, ch. 72, § 6.) Each officer is required to take an oath to support the constitution of the state, and to faithfully discharge the duties of his office; and to give aid or encouragement to the operation of intoxicating liquor saloons, is certainly not supporting either the constitution or the statutes, or at least those portions of the constitution and the statutes which prohibit the sale of intoxicating liquors.

Judgment will be rendered in favor of the plaintiff and against the defendant, as prayed for in the plaintiff's petition.

All the Justices concurring.

