CAROLEE LEEK, *Plaintiff*, v. FRANKLIN RIDDLE THEIS, *Defendant*, STATE OF KANSAS, ex rel., CURT T. SCHNEIDER, Attorney General, *Defendant-Intervenor*.

(539 P. 2d 304)

Opinion filed July 17, 1975.

*Charles N. Henson,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause, and was on the brief for the plaintiff.

*Edward G. Collister, Jr.,* of Collister & Kampschroeder, of Lawrence, argued the cause, and was on the brief for the defendant.

*John R. Martin,* assistant attorney general, argued the cause, and *Curt T. Schneider,* attorney general, was with him on the brief for the defendant-intervenor.

*Robert A. Coldsnow,* of Topeka, was on the brief *amici curiae,* for Kansas Senate, Kansas House of Representatives and Kansas Legislative Coordinating Council.

*F. G. Manzanares,* of Topeka, was on the brief *amicus curiae,* for Arthur R. Diaz.

*Jim J. Marquez* and *Robert A. Olsen,* were on the brief *amicus curiae,* for the Office of the Governor.

The opinion of the court was delivered by

SCHROEDER, J.: This is an original action in quo warranto brought pursuant to Art. 3, § 3, of the Kansas Constitution and K. S. A. 60-1201 *et seq.*

At immediate issue is a position on the Kansas adult authority claimed by the rival appointees of the immediate past governor, Robert Docking, and the present governor, Robert Bennett.

The legal issue is whether the provisions of K. S. A. 22-3707 providing for senatorial confirmation of gubernatorial appoint-

ments to the Kansas adult authority is constitutional. Involved in the determination of this issue is whether a vacancy existed on the Kansas adult authority to which Carolee Leek (plaintiff) could be appointed by Governor Bennett, and whether the Kansas Senate could lawfully non-confirm and reject the appointment of Franklin Riddle Theis (defendant) by Governor Docking. On May 9, 1975, this court also directed the parties to brief the question of whether the defendant, Franklin Riddle Theis, was deprived of any constitutional right by the failure of the Kansas Senate to afford him a hearing before acting upon his appointment to the Kansas adult authority.

The Kansas adult authority, hereafter referred to as the Authority, is a state agency created by legislative act appearing at K. S. A. 22-3707. (L. 1970, ch. 129, § 22-3707; L. 1972, ch. 317, § 80; and L. 1973, ch. 339, § 60.) The Authority is designed to supersede the state board of probation and parole. The Authority consists of five members who serve four year terms, and who are "to be appointed by the governor with the advice and consent of the senate." The three members of the state board of probation and parole were to remain members of the newly created Authority. Provision was made for two new members to join the Authority with terms commencing July 1, 1974.

The facts are stipulated. On January 2, 1975, defendant, Franklin Riddle Theis, was appointed a member of the Authority by Robert Docking, then governor of the state of Kansas, for a term to expire on June 30, 1978. Since K. S. A. 22-3707 provides for the appointment of members of the Authority by the governor with the advice and consent of the Kansas Senate, on January 9, 1975, Governor Docking submitted to the senate a letter recommending the appointment of Mr. Theis. Although the letter was received by the president of the senate on January 10, 1975, the letter was not entered in the journal of the senate until March 25, 1975.

Prior to Governor Docking's recommendation being entered in the journal of the senate, the newly elected governor, Robert Bennett, in a letter to the president of the senate dated March 24, 1975, advised the senate of his desire to change the composition of the Authority and other boards to be representative of the geographical, racial and sex mix of our Kansas population, and generally responsive to the philosophical thrust of his new administration "as it attempts to reorganize government, to reduce administrative costs, to increase the effectiveness of personnel and to carry forward those

basic governmental programs that are so badly needed in this state." (Journal of the Senate, March 25, 1975, p. 463.) In one March 24, 1975, letter to the senate, Governor Bennett supported senate confirmation of numerous appointees of former Governor Docking. But, in another March 24, 1975, letter to the senate, Governor Bennett recommended that the appointment of the defendant and seventeen other Docking appointees be not confirmed by the senate. (Journal of the Senate, March 25, 1975, pp. 463, 464.) Governor Bennett and several senators indicated this recommendation for non-confirmation should not be taken as a reflection either on the capability or integrity of the defendant and other Docking appointees. Indeed both claimants stipulate to the general qualifications of their adversary in these proceedings to fill a vacancy existing since July 1, 1974.

On March 25, 1975, the defendant's appointment was set as a special order of business for the senate for the next day. By this action the matter of the appointment of the defendant was not referred to a senate committee for consideration, prior to the full senate's action on his appointment.

On March 26, 1975, the defendant by letter dated and delivered to the president of the senate, prior to a vote on his appointment, requested a senate hearing on his appointment. However, no senate hearing was held concerning defendant's appointment. Instead, the full senate by its action rejected the appointment of the defendant. The vote of the senate was on "bulk roll call." Twenty-six republican senators voted to reject the defendant's appointment, thirteen democratic senators voted to confirm the defendant's appointment, and one democratic senator was recorded as absent or not voting.

Effective March 26, 1975, Governor Bennett then appointed the plaintiff to a position of membership on the Authority for a term to expire on June 30, 1978, the same position of membership claimed by the defendant under the appointment of Governor Docking. Plaintiff's appointment was then submitted to the senate for confirmation on March 26, 1975. (By letter addressed to the president of the senate dated March 25, 1975, the executed appointment of plaintiff by Governor Bennett as a member of the Authority was submitted to the senate for its confirmation. The letter was entered in the journal of the senate for March 26, 1975. Governor Bennett, by letter dated April 9, 1975, to the president of the senate, advised that the date of his letter was incorrectly typed as March 25, 1975, and that his appointment of plaintiff was made on March 26, 1975,

following the above mentioned senate rejection of defendant's appointment.)

The plaintiff's appointment was referred to the committee on federal and state affairs, and on April 8, 1975, it recommended the plaintiff's membership on the Authority be confirmed. On April 9, 1975, the senate consented to and confirmed the appointment of the plaintiff.

Since the action of the senate rejecting the defendant's appointment, the appointment of plaintiff to the position formerly held by the defendant, and plaintiff's confirmation by the senate, the defendant has attempted to occupy the office and exercise the duties of a member of the Authority. Hence an original action in quo warranto was brought before this court, pursuant to Art. 3, § 3, of the Kansas Constitution and K. S. A. 60-1201 *et seq.*, to determine which party is entitled to the office in question.

On April 18, 1975, the attorney general for the State of Kansas, Curt T. Schneider, moved to intervene as a party defendant pursuant to K. S. A. 1974 Supp. 60-224 (c) (2). (The attorney general had previously filed attorney general opinion 75-151, concluding that senate review is unnecessary to validate or invalidate a lawfully executed gubernatorial appointment.) On April 21, 1975, the motion to intervene was granted. A motion to intervene by Arthur R. Diaz, a Docking appointee to the Kansas civil rights commission, who was also rejected and non-confirmed by the senate, was denied. However, he was given leave to file a brief *amicus curiae* pursuant to K. S. A. 1974 Supp. 60-2701, Rule No. 8 (h). Applications for leave to file a brief *amicus curiae* were also granted to both the Office of the Governor and the Kansas Senate, the Kansas House of Representatives and the Kansas Coordinating Council.

On this state of the record oral arguments were set and heard before the court on June 2, 1975. After duly considering the briefs and oral arguments of the respective parties, this court entered judgment for plaintiff in *Leek v. Theis*, 217 Kan. 277, ____ P. 2d ____, (decided June 3, 1975), as follows:

"Upon due consideration by a unanimous court, we conclude the challenged act is not constitutionally infirm. Pursuant to K. S. A. 60-1204, judgment is rendered in favor of plaintiff ousting the defendant from membership on the Kansas adult authority, and the defendant is ordered to deliver to the plaintiff all the books and papers in his custody or within his power belonging to the Kansas adult authority. This brief opinion announcing our decision will be implemented by a formal opinion to be filed when it is prepared."

At the threshold the court must determine whether there was a vacancy in the position of membership to which the plaintiff was appointed by Governor Bennett.

In *Barrett v. Duff,* 114 Kan. 220, 217 Pac. 918, three defendants, Duff, Crawford, and Greenleaf, were appointed and commissioned state oil inspector, judge of the court of industrial relations and a member of the public utilities commission, respectively, by Governor Allen at various times in 1921 and 1922. The court directed attention to the statutory provisions: (1) With respect to the state oil inspector the governor shall appoint some suitable person "whose term, when confirmed by the senate, shall be for four years" (L. 1913, ch. 200, § 2); (2) with respect to the court of industrial relations, the judges were to be appointed by the governor "by and with the advice and consent of the senate" (L. 1920, ch. 29 § 1); (3) with respect to appointments to the public utility commission, commissioners were to be "appointed by the governor, by and with the advice and consent of the senate." (L. 1921, ch. 260, § 1.) Pursuant to the statutory authorization in January 1923, the legislature convened, adopted a motion to consider recess appointments, and referred the Allen appointees to committee. In February and March of 1923, newly elected Governor Davis submitted to the senate the names of the three plaintiffs, Barrett, Goodrich and Rice, for the positions occupied by the defendants. On March 7, 1923, the senate confirmed the appointments of Governor Allen, the defendants. Nevertheless Governor Davis issued commissions to plaintiffs, and a quo warranto action was brought. The court held there must first have existed vacancies in the respective offices. In the opinion the court said:

". . . An office may not be filled by a new incumbent until it is vacant. An office is not vacant so long as it is supplied in the manner provided by the constitution or law with an incumbent who is legally qualified to exercise the power and perform the duties which pertain to it. It is vacant when it has no incumbent authorized to perform its functions. . . ." (p. 232.)

The power of the governor to make a valid appointment to an office or position of membership then does not arise until there is a vacancy in fact. (63 Am. Jur. 2d, Public Officers and Employees, § 127 p. 707, 708.) An incumbent's title, if valid, cannot be extinguished or affected by the governor's erroneous judgment that the office is vacant. (*Barrett v. Duff,* supra, and *Lynch v. Chase,* 55 Kan. 367, 374, 40 Pac. 666.)

Here, if Governor Docking's appointment of the defendant was

valid without senate confirmation, the actions of Governor Bennett in attempting to appoint the plaintiff were of no effect.

Three Kansas cases imply the senate's rejection of the defendant created a vacancy. In *Barrett v. Duff,* supra, the court held where the appointment to an office is vested in the governor, with the advice and consent of the senate, and the governor appoints a person to the office which is vacant, the appointment vests in the appointee a right to hold for his full term, *subject only to be defeated by nonconcurrence or rejection of the senate.* (Syl. ¶ 2.) In the opinion it was noted that had the senate rejected the defendants' appointments, their offices would thereupon have become vacant and the governor would have had the power to appoint other persons to fill those offices. (*Barrett v. Duff,* supra, p. 234.)

The second case is *The State, ex rel., v. Matassarin,* 114 Kan. 244, 217 Pac. 930. There the action was to determine both membership, and the office of secretary on the state board of health. This controversy arose at the same time as *Barrett,* after Governor Davis' election. The relevant statute concerning membership on the board of health provided for appointment by the governor, by and with the advice and consent of the senate. (G. S. 1915, § 10119.) In determining board membership it was decided:

". . . [T]hat the appointments of the members, although not acted on by the senate and which have never been rejected by that body, entitles them to hold their offices to the end of their terms or *until the appointments are considered and rejected by the senate.*" (Emphasis added.) (Syl. ¶ 1.)

The *Matassarin* opinion also stated if the appointments had been submitted to the senate, and it had considered and rejected them, a vacancy would have been created and the governor would have had power to appoint their successors to hold during the remainder of their terms.

*Driscoll v. Hershberger,* 172 Kan. 145, 238 P. 2d 493, was an original action in quo warranto to determine the right of opposing claimants to hold office as a member of the board of regents. At that time the board of regents was organized and existed by virtue of G. S. 1949, 74-3201, as follows:

"There is hereby created a state board to be known as the board of regents . . . the governor shall appoint, with the advice and consent of the senate, nine competent citizens of this state to be and act as the board of regents. . . . Whenever appointments to the board of regents are made when the senate of the state of Kansas is not in session such appointments shall hold until the senate has acted thereon. If the senate shall fail to approve such appointment, the governor shall make a new appointment to fill

out the unexpired term of such member who has failed of confirmation. All vacancies in the board shall be filled by appointment by the governor for the unexpired term subject to confirmation by the senate at the next regular or special session of the legislature. . . ."

Briefly stated, *Driscoll* received a recess appointment as a board of regents member in 1949. His appointment was not approved by the senate at the next succeeding or 1951 senate session.

The specific wording of the statute was of considerable importance in holding that because the senate adjourned without approving plaintiff's appointment, a vacancy in the office occurred.

In *Driscoll* the court noted that if the statute under which plaintiff received his 1949 recess appointment was of the same tenor and effect as the statutes involved in *Barrett* and *Matassarin,* the plaintiff would have been entitled to hold office *"until his appointment was adversely acted upon by the senate* or until it expired by lapse of time." (Emphasis added.)

Although these cases involve offices previously established and occupied, and the instant case involves a newly created position, we deem the difference insignificant. These cases refer to senate confirmation in various manners. Various statutes have used the words "advice", "consent", "approval" and "confirmation" as though they were synonymous. (*Driscoll v. Hershberger,* supra, at 155.) For our purposes here no significant difference is attributable to these terms.

Taken collectively, the foregoing cases compel the conclusion that the senate's non-confirmation and rejection of the defendant, if valid, did create the necessary vacancy in the position to which the plaintiff was appointed. But as defendant and *amici* argue, these cases did not involve a constitutional challenge to senatorial confirmation.

Here this court is squarely confronted, for the first time, with a constitutional challenge to the validity of a statute requiring senatorial approval or rejection of a gubernatorial appointment. In other words, may the senate lawfully non-confirm and reject the appointment of the defendant by the governor?

Long-standing and well established rules of this court are that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any

reasonable way to construe the statute as constitutionally valid, that should be done. (*State, ex rel., v. Fadely,* 180 Kan. 652, 658, 659, 308 P. 2d 537; *Wall v. Harrison,* 201 Kan. 600, 603, 443 P. 2d 266; *Moore v. Shanahan,* 207 Kan. 645, 651, 486 P. 2d 506; and 16 Am. Jur. 2d, Constitutional Law, § 175, pp. 399-401.)

The policy behind these rules is found in Syllabus ¶ 2 of *Higgins v. Cardinal Manufacturing Co.,* 188 Kan. 11, 360 P. 2d 456, *cert. denied,* 368 U. S. 829, 7 L. Ed. 2d 32, 82 S. Ct. 51, (1961) as follows:

"A constitution must be interpreted liberally to carry into effect the principles of government which it embodies. It deals broadly with general subjects, and its language should not be interpreted in any narrow, refined or subtle sense, but should be held to mean what the words imply to the common understanding of men. In ascertaining the meaning of a constitutional provision courts consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it."

Neither this policy nor the rules are challenged in the instant case, and the court applies these standards in evaluating the defendant's position.

A controversy does arise over the weight to be given the long-standing and widely practiced custom of senate confirmation of gubernatorial appointments. Although not making an exhaustive survey on the point, we note the 1855 territorial legislature in creating a treasury department said in L. 1855, ch. 158, § 1:

"There shall be appointed at the present session of the legislative assembly, by the governor, and with the advice and consent of the legislative council, a territorial treasurer and a territorial auditor of public accounts. . . ."

This is significant because laws in force at the time the constitution was framed are relevant in determining the interpretation of the constitution according to the sense in which the people of the state are supposed to have understood its language. (*Leavenworth County v. Miller,* 7 Kan. 479, 509, 12 Am. R. 425.)

Mr. Justice Harvey's concurring opinion in *Barrett v. Duff,* supra, quotes language used by former governors of Kansas who sought senate confirmation of their appointments. He mentions the legislature of 1863, by chapter 43, provided for a board of directors of the state penitentiary to be appointed by the governor with the advice and consent of the senate. In 1864 he noted the legislature provided for a board of regents for the state university to be appointed by and with the advice and consent of the senate. (L. 1864, ch. 105.) The foregoing indicates the longstanding prac-

tice by the legislature requiring senate confirmation of gubernatorial appointments.

A review of the legislative history concerning the Kansas adult authority and its predecessors, the state board of probation and parole and the state board of administration, reveal a consistent requirement of senatorial confirmation of gubernatorial appointments. (L. 1973, ch. 339, § 60; L. 1972, ch. 317, § 80; L. 1970, ch. 129, § 22-3707; L. 1961, ch. 280, § 2; L. 1957, ch. 331, § 3; L. 1939, ch. 285, § 1; and L. 1917, ch. 297, § 1.)

The long history, indicating continued legislative and executive approval of legislation requiring senatorial confirmation of gubernatorial appointments, augments the requirement that the unconstitutionality of K. S. A. 22-3707 must clearly appear. (*Sartin v. Snell,* 87 Kan. 485, 490, 125 Pac. 47.)

The number of appointments made by the governor which today require senate confirmation is large. An indication is given by the number of appointments submitted by Governor Docking to the Kansas Senate for the 23 boards, authorities and commissions listed in the Journal of the Senate for March 25, 1975. This listing is not exhaustive on the subject. It is said of the governor's 323 appointments, fully 86 require senate confirmation. (Drury, The Government of Kansas, Rev. Ed. 1970, Univ. of Kansas Press, p. 100.)

As early as 1871 the Kansas Supreme Court in *Leavenworth County v. Miller,* supra, said:

". . . [T]his court would hardly assume to declare, in the face of 25 or 26 legislatures that have enacted similar statutes, and 25 or 26 executives that have approved the same, and 25 or 26 supreme courts—state and federal —that have declared such statutes to be constitutional, that this act is clearly unconstitutional beyond all reasonable doubt, or even, that it is clearly unconstitutional.

"But with reference to this particular statute the strongest rule in favor of its constitutionality should be adopted. All presumptions are in favor of its validity. It was not passed through the hurry and bustle of hasty legislation; nor through inadvertance or oversight; nor through whim or capricious fancy; nor through the influences of party drill or party machinery; nor through chicanery, fraud or corruption; but it was passed after due deliberation and discussion. Besides, it is not an isolated statute, standing alone in questionable solitude upon the statute books of Kansas. . . ." (pp. 499, 500.)

While a history of executive and legislative approval of unchallenged statutes does not impart legality to a subsequently enacted statute with the same or similar infirmity, (*Wyandotte County Comm'rs v. General Securities Corp.,* 157 Kan. 64, 79, 138

P. 2d 479), this court deems it probable that had the drafters of our constitution intended that the senate not have powers of confirmation over gubernatorial appointments, they would have prohibited the practice.

The Constitution of the State of Kansas limits rather than confers power, and where a statute is attacked as unconstitutional the question to be determined is not whether its provisions are authorized by the constitution, but whether they are prohibited by it. (*Lemons v. Noller,* 144 Kan. 813, 63 P. 2d 177; *State, ex rel., v. Ancient Order of United Workmen,* 178 Kan. 69, 283 P. 2d 461; *State, ex rel., v. Anderson,* 180 Kan. 120, 299 P. 2d 1078; and *Schumacher v. Rausch,* 190 Kan. 239, 372 P. 2d 1005.)

The defendant and defendant-intervenor contend the Kansas Senate may not lawfully non-confirm and reject the appointment of the defendant by the governor. It is contended:

(1) The power to appoint officers in the executive department is inherently an executive function;

(2) The Kansas Constitution contains no *express* authorization for senatorial confirmation; and

(3) To grant the Kansas Senate powers of confirmation violates the constitutional doctrine of separation of powers.

A brief review of pertinent constitutional provisions will facilitate our examination of the power to appoint. If any provision in the Kansas Constitution supports the defendant's argument, that the power to appoint officers in the executive department is inherently an executive function, it is Art. 1, § 3 which provides:

"The supreme executive power of the state shall be vested in a governor, who shall see that the laws are faithfully executed."

The foregoing provision must be viewed in the light of other constitutional provisions, which, so far as applicable, read:

Art. 2, § 1.

"Legislative power. The legislative power of this state shall be vested in a house of representatives and senate."

Art. 2, § 18. (1974 Supp.)

"Election or appointment of officers; filling vacancies. The legislature may provide for the election or appointment of all officers and the filling of all vacancies not otherwise provided for in this constitution." (Adopted by vote of the people on November 5, 1974.)

Prior to November 5, 1974, the foregoing provision of the Kansas Constitution was a part of Art. 2, § 19, which read:

"Publication of acts; provision for officers; vacancies. The legislature shall

prescribe the time when its acts shall be in force, and shall provide for the speedy publication of the same; and no law of a general nature, shall be in force until the same be published. It shall have the power to provide for the election or appointment of all officers, and the filling of all vacancies not otherwise provided for in this constitution."

Art. 15, § 1.

"Selection of officers. All officers whose election or appointment is not otherwise provided for, shall be chosen or appointed as may be prescribed by law."

A thorough review of the briefs of defendant, defendant-intervenor, and *amici curiae*, as well as an examination of the attorney general's opinion 75-151, reveals no Kansas authority expressly holding the appointive power is inherently executive.

Justice Harvey in his concurring opinion in *Barrett v. Duff*, supra, says the majority opinion purported to find authority for filling a vacancy in the office of state oil inspector in Art. 1, § 3, the faithful execution of laws clause previously quoted. Justice Harvey writes:

". . . But the authorities uniformly hold that such constitutional provision does not confer upon the governor the power to appoint officers, either for full terms or to fill vacancies. The only power the governor has to make official appointments is that conferred upon him by specific constitutional or statutory provisions, and that has been repeatedly recognized, both in our constitution and in our statutes. . . ." (p. 241.)

"A power of appointment is not an exclusive function of the executive, nor has it ever been so considered." (*State, ex rel., v. Kansas Turnpike Authority*, 176 Kan. 683, 695, 273 P. 2d 198; and *State, ex rel., v. Fadely*, 180 Kan. 652, 692, 308 P. 2d 537.)

If there exists in the provisions of Art. 2, § 18 and Art. 15, § 1 of the Kansas Constitution an implied inhibition that the legislature could not appoint members to a board or commission of its own creation, then obviously it could not even appoint members to a board or commission created by its own enactment to perform strictly legislative functions or even its own staff personnel. (See, *State, ex rel., v. Kansas Turnpike Authority*, supra.)

In *Marks v. Frantz*, 179 Kan. 638, 298 P. 2d 316, the court rejected a constitutional challenge to a statute enacted by the legislature creating a board of examiners in optometry. There the act required the governor to appoint a board of examiners in optometry consisting of three members "to be selected from a list of four names for each appointment, submitted by the Kansas optometric

association or its successor." (G. S. 1949, 74-1501 [L. 1923, ch. 220, § 4].) After citing Art. 15, § 1 of our constitution the court stated:

". . . There is no constitutional limitation on who may be appointed, nor any constitutional restriction on the legislature exercising its power as it shall see fit. As a matter of fact the legislature has provided a restricted power of appointment in many instances. . . ." (p. 649.)

A constitutional attack was made upon a legislative enactment creating the office of county auditor in certain counties and conferring upon the district judge the power of appointing a suitable person to such office in *Sartin v. Snell,* 87 Kan. 485, 125 Pac. 47, and it was held to be a valid exercise of legislative authority. The act was challenged as violating the separation of powers doctrine, and the court noting various means provided by statute for the selection of public officers, said:

". . . The constitution contains no inhibition upon the power of the legislature to provide as it may deem best the method for the appointment of officers whose election or appointment is not otherwise provided for. On the other hand, the constitution expressly declares that 'all officers whose election or appointment is not otherwise provided for, shall be chosen or appointed as may be prescribed by law.' (Const. art. 15, § 1.) It will thus be seen that the constitution has placed in the legislature the power to regulate the mode of appointing officers not otherwise provided for. In view of the power thus expressly conferred upon the legislature it seems unnecessary to refer specially to cases from other states, though numerous decisions might be cited where, under constitutions similar to ours, the authority of the legislature to confer upon judges and courts the power to appoint inferior officers whose duties have no connection with the functions of courts is recognized. (*The People, ex rel., v. Hoffman et al.,* 116 Ill. 587, 5 N. E. 596, 56 Am. Rep. 793; *The People v. Board of Supervisors,* 223 Ill. 187, 79 N. E. 123; *The People v. Evans,* 247 Ill. 547, 93 N. E. 388; *City of Indianapolis v. State, ex rel.,* 172 Ind. 472, 88 N. E. 687; *In re Appointment of Revisor,* 141 Wis. 592, 124 N. W. 670.)

"Upon the question whether the power to appoint to office is a legislative, executive, or judicial function the late Mr. Freeman, in a monographic note to *People v. Freeman,* 80 Cal. 233, 22 Pac. 173, used the following language:

" 'The truth is, that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legislative, the executive, or the judicial department. It is commonly exercised by the people, but the legislature may, as the law-making power, when not restrained by the constitution, provide for its exercise by either department of the government, or by any person or association of persons whom it may choose to designate for that purpose. It is an executive function when the law has committed it to the executive, a legislative function when the law has committed it to the legislature, and a judicial function, or at least a function of a judge, when the law has committed it to any member or members of the judiciary.' (13 Am. St. Rep. 122, 130.)

"It is apparent, therefore, that it is a valid exercise of legislative authority to impose upon the judge of the district court the power of appointing a county auditor." (pp. 494, 495.)

Defendant and defendant-intervenor direct our attention to a number of cases from foreign jurisdictions. Our Kansas Constitution was modeled after that of Ohio. (Perdue, *The Sources of the Constitution of Kansas,* in 7 Transactions of the Kansas State Historical Society 131 [G. Martin ed. 1902]; and *State, ex rel., v. Fadely,* supra, at 699.) Two Ohio cases cited to this court (*The State, ex rel. Attorney General, v. Kennon et al.,* 7 Ohio St. Rep. 546 [1858]; and *State, ex rel., v. DiSalle,* 172 Ohio St. 363, 176 N. E. 2d 428 [1961]) where legislative enactments requiring that the names of appointees be submitted to the Ohio Senate for its advice and consent were declared unconstitutional, are not comparable to our situation. These decisions were based upon Art. II, § 27, of the Ohio Constitution which reads:

"The election and appointment of all officers, and the filling of all vacancies, not otherwise provided for by this constitution, or the constitution of the United States, shall be made in such manner as may be directed by law; *but no appointing power shall be exercised by the general assembly, except as prescribed in the constitution.* . . ." (Emphasis added.)

Article 4, § 18 of the Topeka Constitution of 1855, and Art. 4, § 17 of the Leavenworth Constitution of 1858 each contained a similar provision but the Wyandotte Convention did not adopt that provision.

As a result of the *DiSalle* decision in the 1961 Ohio general elections a new provision to the Ohio Constitution, Art. III, § 21, was adopted. It provides: "When required by law, appointments to state office shall be subject to the advice and consent of the Senate." (Schroeder, *Survey of Ohio Law—Constitutional Law,* 13 W. Res. L. Rev., 425, 447 [1962].)

Three Indiana cases regarding the appointment power are urged upon this court by the defendant. (*The State, ex rel. Hovey v. Noble et al.,* 118 Ind. 350, 21 N. E. 244 [1889] [an act creating the offices of commissioner of the supreme court and providing for the appointment of persons to fill them by the general assembly was held unconstitutional]; *The State, ex rel. Holt et al., v. Denny, Mayor, et al.,* 118 Ind. 449, 21 N. E. 274 [1889] [an act permitting the Indiana General Assembly to appoint members of the Indianapolis police and fire department boards was held unconstitutional]; and *The State, ex rel. Yancey, v. Hyde,* 121 Ind. 20, 22 N. E. 644 [1889] [an enactment providing the Indiana General Assembly may elect the director of the department of geology and natural resources was held unconstitutional].)

These decisions, predicated in part on the *Kennon* case from Ohio, all involved *direct* appointments by the Indiana General Assembly to various offices. We are not here faced with that question. While the Indiana Constitution has a provision similar to Art. 15, § 1, of the Kansas Constitution, it also has Art. 3, § 1 which provides:

"The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise *any* of the functions of another, except as in this *Constitution* expressly provided." (Emphasis added.)

A provision similar to Art. 3, § 1 of the Indiana Constitution was in Art. 3, § 1 of both the Topeka Constitution of 1855 and the Leavenworth Constitution of 1858, but was not included in the Wyandotte Constitution of 1859, which Kansas finally adopted. The rigid separation of powers moulded into the Indiana Constitution is not a part of the Kansas Constitution. Our constitution authorizes more flexibility.

*Taylor v. The Commonwealth*, 26 Ky. (3 J. J. Marshall) 401 (1830) is cited to this court for the language that "Appointment to office is *intrinsically* 'EXECUTIVE' ", but there the court upheld an appointment made by a court exercising judicial powers. Although the Kentucky Constitution contains an express separation of powers clause, similar to Indiana, in *Sinking Fund Commissioners, etc., v. George, etc.,* 104 Ky. 260, 47 S. W. 779 (1898) a legislative act creating a board of penitentiary commissioners to be elected by the Kentucky General Assembly was upheld. The Kentucky court held that the power to elect officers to fill offices created by statute does not necessarily belong to the executive department and may therefore be conferred by statute upon the legislature. The Kentucky court held:

"There is no express power conferred upon the executive department by the Constitution to appoint such officers or agents which the General Assembly may designate for the direction or control of the penitentiaries. Neither is such power implied from any provision of the Constitution. There is no provision of the Constitution which places any limitation on the power of the legislative department to name or select the officers or agents necessary to properly manage the penal institutions. Neither is there any provision of the Constitution from which it can be fairly implied that the legislative department shall not elect or select those who may aid or control in the conduct of the affairs of the penal institutions. When the Constitution has imposed no limits upon the legislative power, it must be considered practically absolute. Plenary power in the Legislature for all purposes of civil govern-

ment is the rule. A prohibition to exercise a particular power is the exception. . . ." (pp. 263, 264.)

(See also the Kentucky opinion in, *Sewell and Allington v. Bennett and Levi*, 187 Ky. 626, 220 S. W. 517 [1920]; and *Elrod v. Willis, Governor*, 305 Ky. 225, 203 S. W. 2d 18 [1947].)

The Supreme Court of North Dakota in a landmark case, *State v. Boucher*, 3 N. D. 389, 56 N. W. 142 (1893), provides an excellent history and summary of the appointment power. Under the common law of England, the sovereign power belonged to the king, and the power to appoint was unquestionably a sovereign prerogative. In this country the sovereignty and the power to appoint have been transferred to the people. It is not exclusively an executive function. (See, *Coleman v. Newby*, 7 Kan. 82, opinion by Valentine.) The North Dakota court in *Boucher* said:

". . . We do not think that all power to appoint to office resides with the governor of a state as an implied executive function in cases where the constitution is silent upon the question. . . ." (p. 395.)

In Kansas it is equally clear the appointment power is not expressly or inherently lodged in the executive. (*Barrett v. Duff*, supra; *State, ex rel., v. Kansas Turnpike Authority*, supra; and *State, ex rel., v. Fadely*, supra.)

Regarding the power of appointment the North Dakota court in *Boucher* said:

". . . Unless, therefore, this power resides in the legislature, it is lodged in no part of the government. As to this it will suffice to say that all governmental sovereign power is vested in the legislature, except such as is granted to the other departments of the government, or expressly withheld from the legislature by constitutional restrictions." (p. 396.)

In evaluating the constitutional philosophy that the residuary power of the people is vested in the legislature, a fundamental distinction must be made between the federal and state constitutions, and the authority of the United States Congress under the one and the state legislature under the other. The federal government is one of delegated, enumerated and limited powers. When an act of Congress is assailed as void, it is necessary to look to the federal constitution for a specific grant of power. When an act of a state legislature is assailed as void, it is only necessary to look to the federal and state constitutions for a specific restriction on that power. Thus an act of a state legislature on a rightful subject of legislation, is valid unless prohibited by the federal or state constitution. (*Wentz v. Thomas*, 159 Okla. 124, 15 P. 2d 65 [1932];

*Ingard v. Barker*, 27 Idaho 124, 147 Pac. 293 [1915]; and *State v. Boucher*, supra.)

The defendant and defendant-intervenor take serious issue with the proposition that the residuary power of the people is vested in the legislature by the Kansas Constitution. The logical conclusion to the defendant's argument is that there exists a void in the delegation of sovereign power by the people to the various departments of our government. On this premise they seek to distinguish *Boucher*.

The basis for the defendant's position has its origin in opinions of the Kansas court written a century ago. Mr. Justice Valentine in *Leavenworth County v. Miller*, 7 Kan. 479, said:

". . . [U]nless the constitution of the State authorizes them [the legislature] to enact such a law as the one now under consideration, they had no authority to do so. . . ." (p. 489.)

Syllabus ¶ 3 of the opinion reads:

"The legislature cannot exercise any power retained by the people, or not delegated by the people to the legislature."

The foregoing tend to support the defendant's argument, but other portions of the opinion (see, p. 499) are inconsistent with it. Similar language is found in, *The State, ex rel., v. City of Topeka*, 31 Kan. 452, 2 Pac. 593 (Valentine, J.); *In re Sims, Petitioner*, 54 Kan. 1, 37 Pac. 135; *The State, ex rel., v. Knapp*, 99 Kan. 852, 163 Pac. 181; and *Parks v. Board of Com'rs.*, 61 Fed. 436 (D. Kan. 1894).

Statements made in *The State, ex rel., v. City of Topeka*, supra, that the various branches or departments of the government are simply the instruments of sovereignty, and not the sovereignty itself, are explained in *The State v. Durein*, 70 Kan. 1, 78 Pac. 152, rehearing, 70 Kan. 13, 80 Pac. 978, aff'd 208 U. S. 613, 52 L. Ed. 645, 28 S. Ct. 567 (1908), where the court said:

"But the people have set the constitution over themselves as a limitation upon their own sovereignty, and it is their duty to obey it precisely the same as officials who are given authority under it. By that instrument a government has been established, and its powers defined and distributed. Among the powers granted are such as are designated legislative, executive, and judicial. These are sovereign powers, and the people, having delegated them to instruments of their own creation, cannot interfere with their exercise. They may meet in their organized political capacity and change the fundamental law, but so long as the constitution stands they cannot legislate, or execute laws, or adjudicate controversies. The recognition of any other doctrine would sound the death-knell of constitutional government.

"It is elementary law that grants of power by state constitutions to state legislatures include all legislative power that is not expressly withheld. . . ." (pp. 36, 37.)

Even if it be assumed a residuary power exists in the people which has not been delegated, Art. 15, § 1 calling for appointments as may be *prescribed by law,* is an express delegation of power to the legislature. In *Coleman v. Newby,* supra, Valentine, J., writes:

" '. . . The laws of a State are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long established local customs having the force of laws. . . .' " (p. 92.)

More recent decisions of the court have been consistent on the extent of power granted to the legislature by the Kansas Constitution. In *Jansky v. Baldwin,* 120 Kan. 332, 243 Pac. 302, (opinion denying rehearing, 120 Kan. 728, 244 Pac. 1036); quoted in *Schumacher v. Rausch,* 190 Kan. 239, 244, 372 P. 2d 1005, the court said:

" 'Under our form of government all governmental power is inherent in the people. Some governmental powers are delegated to congress, or to the federal government, by our federal constitution; those not so delegated are retained by the people. Hence, congress has no legislative power not granted to it by the federal constitution. This is not true of a state constitution. Since the people have all governmental power, and exercise it through the legislative branch of the government, the legislature is free to act except as it is restricted by the state constitution, and except, of course, the grant of authority to the federal government by the federal constitution.' (p. 334.)"

Other cases in accord with the foregoing are: *Wilson v. Clark,* 63 Kan. 505, 65 Pac. 705; *Sartin v. Snell,* supra; *Hicks v. Davis,* 97 Kan. 312, 154 Pac. 1030, *reh. denied,* 97 Kan. 662, 156 Pac. 774; and *Manning v. Davis,* 166 Kan. 278, 201 P. 2d 113.

We conclude the general power of appointment to public office under the Kansas Constitution is not an exclusive function of the executive, and the exercise of the power of appointment is not inherently an executive function. Within constitutional limits the legislature, as representative of the people, can vest the power in its discretion.

We turn next to the defendant's argument that the Kansas Constitution contains no express authorization for senatorial confirmation of members appointed to the Authority by the governor. Defendant and defendant-intervenor rely in large part on language from *State, ex rel., v. State Office Building Commission,* 185 Kan. 563, 345 P. 2d 674, where the court said:

". . . Under the state constitution, the only power granted by the people to the legislature in Article 2 is *legislative power.*" (p. 568.)

The foregoing statement asserted in isolation is misleading. This court has frequently said that a statement of law in a given case must be tempered by the facts which give rise to its pronouncement. In the *State Office Building* case the statute under constitutional attack required the governor to appoint a seven member commission for the performance of executive duties *entirely from members of the legislature.* This was clearly a case confined to the separation of powers, where one department ( the legislative) sought to enact a statute which would usurp the whole power of another (the executive) by requiring the appointment of legislative members to the commission. In the words of James Madison, "that where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted." (*Federalist* No. 47, quoted more fully in *Van Sickle v. Shanahan,* 212 Kan. 426, 446, 511 P. 2d 223.) Confined to the facts in the *State Office Building* case the quoted statement was proper, but on the facts here the statement is submerged in the body of constitutional law interpreted by our many decisions some of which are discussed herein.

One of the rules is that where the constitutionality of a state statute is involved, the question presented is not whether the act is expressly or impliedly authorized by the constitution, but whether it is expressly or impliedly prohibited by the constitution. *Hunt v. Eddy,* 150 Kan. 1, 4, 5, 90 P. 2d 747; *State, ex rel., v. Anderson,* supra at 125; *State, ex rel., v. Fadely,* supra, at 692; *Schumacher v. Rausch,* supra, at 244; and *Wall v. Harrison,* supra, at 603.

The question concerning the power of the legislature to provide as it may deem best the method for the appointment of officers whose election or appointment is not otherwise provided for was thoroughly discussed in *Sartin v. Snell,* supra, heretofore quoted at length.

The Kansas Constitution makes no express grant to the governor of appointive power except in specific and limited cases and in express terms. The governor was granted executive power by the provisions of Art. 1, but such grant did not include exclusive, general appointing power. Nothing in the executive article expressly grants the governor appointive power. On the contrary, in the legislative article express provisions are made in Art. 2, § 19 (now Art. 2, § 18), and in Art. 15, § 1 (Miscellaneous) express provisions are made, which generally provide that elections and appointments to offices not otherwise expressly provided for in the constitution are to be

prescribed by law enacted by the legislature. Specific provision is made in Art. 6, § 3 (*b*) concerning the state board of regents. It provides that the "members shall be appointed by the governor, subject to confirmation by the senate." Until the constitutional revision of 1972, Art. 7, § 1, similarly provided that trustees of the state benevolent institutions "shall be appointed by the governor, by and with the advice and consent of the senate." This provision is now deleted from the Kansas Constitution.

The executive article of the Kansas Constitution was before the voters in 1972, and the legislative article was before the voters in 1974. The practice of the legislature providing for the manner of selection and appointment of executive officers and providing for confirmation thereof by the Kansas Senate had over a century of history in Kansas, and the question of confirmation and rejection of gubernatorial appointees had been before the Kansas Supreme Court several times during this period. If the people of Kansas had supposed their constitution to provide for a situation any different than what had been the practice for over 100 years, and had any disagreement with the manner in which this court had applied the various statutes on the subject, they would have addressed themselves to this issue in specific terms within the past three years.

Absent express constitutional prohibition which restricts or limits senate confirmation, the question is whether there is a restriction or limitation implied from the inherent provisions of the constitution which provide for three distinct and separate departments of government—legislative, executive and judicial. Defendant and defendant-intervenor forcefully argue that granting the senate confirmation powers violates the constitutional doctrine of separation of powers.

Like the Constitution of the United States, the Constitution of Kansas contains no express provision requiring the separation of powers, but all decisions of this court have taken for granted the constitutional doctrine of separation of powers between the three departments of the state government. *State, ex rel., v. Kansas Turnpike Authority,* supra; and *State, ex rel., v. Fadely,* supra, contain numerous citations. (*Coleman v. Newby,* supra; *In re Sims, Petitioner,* supra; *In re Davis,* 58 Kan. 368, 49 Pac. 160; *In re Huron,* 58 Kan. 152, 48 Pac. 574; *The State v. Johnson,* 61 Kan. 803, 60 Pac. 1068; *The State v. Railway Co.,* 76 Kan. 467, 92 Pac. 606, *aff'd,* 216 U. S. 262, 54 L. Ed. 472, 30 S. Ct. 330 [1910]; *Hicks v. Davis,* supra; *Ruland v. City of Augusta,* 120 Kan. 42, 242 Pac.

456; *Verdigris Conservancy District v. Objectors,* 131 Kan. 214, 289 Pac. 966; and *State, ex rel., v. Ancient Order of United Workmen,* 178 Kan. 69, 283 P. 2d 461.)

The separation of powers doctrine is designed to avoid a dangerous concentration of power, and to allow the respective powers to be assigned to the department best fitted to exercise them. (*Van Sickle v. Shanahan,* supra.) In further considering federal constitutional history, the Federalist Papers deal with the separation of powers in the proposed federal government and in the states as well. Federalist Papers Nos. 47 to 51, inclusive, deal with this proposition. The first two of the series were written by James Madison and the last three by Alexander Hamilton. Both Madison and Hamilton were in complete agreement that the constitution, which they had been most influential in framing, provided for the separation of the powers of government between the three departments with a few exceptions. (*State, ex rel., v. State Office Building Commission,* supra, at 570.)

Beyond the Federalist Papers the separation of powers theory can be traced to the influential writings of Montesquieu who concluded that the separation of powers was the cornerstone of a free government. In *Van Sickle v. Shanahan,* supra, Chief Justice Fatzer set forth an excellent history on the separation of powers doctrine which does not need further elaboration.

Despite the excellent theoretical framework which various cases have constructed, this court has held the separation of powers of government has never existed in pure form except in political theory. (*The State v. Railway Co.,* supra, at 474; *State, ex rel., v. City of Topeka,* 176 Kan. 240, 245, 270 P. 2d 270.) This court cannot be overcome by the repetition of theory piled higher and higher in matters concerning the separation of powers before the facts and practical aspects of the problem have been thoroughly exploited by judicial thought. (*State, ex rel., v. Fadely,* supra, at 693.) We must search for a usurpation by one department of the powers of another department on the specific facts and circumstances presented. (*State, ex rel., v. Fadely,* supra, at 697; and see, *Van Sickle v. Shanahan,* supra, at 446.)

Theoretically then it is important to rigidly separate the legislative, judicial and executive functions and prevent officers of one department from exercising another's functions. However, practically, the absolute independence of the departments and

complete separation is both impractical and unintended. (*In re Sims, Petitioner,* supra, at 11 [Johnson, J., concurring].)

There is no quarrel that our constitution creates three distinct and separate departments. In this respect our state constitution is the same as our federal constitution. (*State, ex rel., v. Fadely,* supra, at page 696.) In *O'Donoghue v. United States,* 289 U. S. 516, 77 L. Ed. 1356, 53 S. Ct. 740 (1933) Justice Sutherland aptly said:

"The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of governmental mechanism. Its object is basic and vital . . . namely, to preclude a commingling of these essentially different powers of government in the same hands. . . .

"If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, *but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments. . . .*" (Emphasis added.) (p. 530.)

The defendant forcefully argues the power of advice and consent given to the senate, directly or indirectly, subjects the executive to coercive legislative influences. This question must be evaluated with reference to the specific facts and circumstances involved as our past cases have done in dealing with the separation of powers.

In the *Turnpike* case, a unanimous court held the appointment of two legislative chairmen, as ex-officio members of a seven member Kansas Turnpike Authority, was not an unauthorized attempt to confer executive powers upon the legislature. (*State, ex rel., v. Kansas Turnpike Authority,* supra, at 695.) The legislature did not exercise a coercive influence or control by having only two of seven members.

Similarly in the finance council case the court held the appointment of four legislators as ex-officio members of a seven member state finance council, which by *unanimous vote* of all its members was authorized to expend funds in emergencies and extraordinary circumstances, was constitutional. (*State, ex rel., v. Fadely,* supra, at 654, 657, 667.) As the concurring opinion of three justices explains, the finance council members, with its representative legislative and executive constituency, had to cooperate in order to function. Without cooperation there could have been no viable state

finance council because every member had a veto power. (*State, ex rel., v. Fadely,* supra, at 694, 695 [Schroeder, J., concurring].) There the legislature could not be said to exercise a coercive influence because cooperation was necessary to act.

In the *State Office Building* case a statute directing the governor to appoint a seven member commission for the performance of executive duties entirely from legislative members was implied to be a coercive influence in violation of the separation of powers doctrine. (*State, ex rel., v. State Office Building Commission,* supra, at 574.) There the executive department had no role whatsoever, but was simply given a *fait accompli.*

Many Kansas cases indicate the legislature may constitutionally restrict, by way of statute, the gubernatorial choice of an appointee by imposing explicit qualifications such as limiting the choice to persons with certain educations, (*Jansky v. Baldwin,* supra); to residents of a particular town, (*The State, ex rel., v. Hunter,* 38 Kan. 578, 17 Pac. 177); to members of a certain occupation, (*Marks v. Frantz,* supra; and *The State, ex rel., v. Matassarin,* 114 Kan. 244, 217 Pac. 930); to persons of a particular political party, (*Goodrich v. Mitchell,* 68 Kan. 765, 773, 75 Pac. 1034); or to legislators, (*State, ex rel., v. Fadely,* supra). How can it then be said that approving the appointee is inherently coercive?

The defendant, in attempting to persuade this court the power of advice and consent of the senate inherently encroaches upon the performance of the executive department of government, and sacrosanct doctrine of separation of powers, must first come to grips with the United States Constitution and the Kansas Constitution which expressly require the advice and consent of the senate in certain instances. If such advice and consent requirement is inherently and always coercive, would it have been expressly included in these documents? We think not. Can the failure to expressly include the advice and consent provisions in the Kansas Constitution for other offices be construed to imply that it is inherently and always coercive? Again we think not.

It is suggested that giving advice and consent powers to the senate transcends the "cooperation" referred to in the *Fadely* case. Admittedly the recent political relationship between the governor and the senate does not suggest a cooperative effort, but within the inherent nature of the gubernatorial appointment, with the advice and consent of the senate, is a requirement of cooperation and a working of the system of checks and balances. Until legislative re-

jection and non-confirmation, the gubernatorial appointee holds his office. (*Barrett v. Duff*, supra.) The senate has only a negative veto. It is no more coercive than the gubernatorial veto of legislation. Indeed, here the decision of the legislature to subject the membership on the Authority to "advice and consent" powers of the senate was subject to gubernatorial veto on the three occasions, when the act creating the Authority and its predecessors was before the governor. (See, No. 2 G. Haynes, The Senate of the United States, 753 [1960].)

The creation of various offices and departments of government not otherwise provided for in the Kansas Constitution is a legislative function. It is also a legislative function to determine the qualifications of the officers and by whom they shall be appointed and in what manner they shall be appointed. The Kansas Constitution contains no limitation on who may be appointed, and there is no constitutional restriction on the legislature exercising its power as it shall see fit. (*Marks v. Frantz*, supra, at 649; *Goodrich v. Mitchell*, supra, at 768; and *People v. Freeman*, 80 Cal. 233, 22 Pac. 173, 13 Am. St. R. 122 [1889].)

It should also be remembered that the confirmation of an appointment of a public officer to a public office is to be distinguished from the appointment itself, for the senate in confirming the appointment does not in any sense choose the appointee. In *Attorney General v. Oakman*, 126 Mich. 717, 86 N. W. 151, (1901), it was held the act of confirming an appointee to an office was not the exercise of an executive function but was a legislative function under the senate's procedure.

Assuming the power of appointment to public office is an executive function, such power was exercised and exhausted when the appointment of the defendant was made. The senate in rejecting the appointment was not exercising a power of appointment. (*Barrett v. Duff*, supra; *Marbury v. Madison*, 5 U. S. [1 Cranch 49] 137, 2 L. Ed. 60, [1803]; and *State Police Bd. of Ind. v. Moore*, 244 Ind. 388, 193 N. E. 2d 131 [1963].)

In *State v. Boucher*, supra, the North Dakota court said:

". . . The legislative department, as such, has not sought to exercise or to participate in exercising the appointing power. It has simply designated certain existing officers, to wit, the senators, who should thus participate. . . ." (p. 403.)

In No. 66 of the *Federalist*, Alexander Hamilton wrote, "there will, of course, be no exertion of choice on the part of the Senate.

They may defeat one choice of the Executive and oblige him to make another; but they cannot themselves choose—they can only ratify or reject the choice." (*The Federalist* No. 66, at 405, [New American Library ed. 1961].)

If for the purposes of argument it is conceded the appointing act is an executive function, then this executive function may be and is exercised by each of the three departments of government. This is witnessed by the fact that courts appoint clerks, referees and other officers to handle ministerial duties to assist the courts, and the legislature appoints various officers and staff members who are not members of the legislature to provide ancillary services to the legislature. To contend that the appointing act was exclusively an executive power belonging only in the executive department to be exercised only by the governor, would certainly not be consistent with a strict application of the doctrine of separation of powers wherein each department of government must and does perform some executive functions. Thus, what is meant by referring to an appointing act as an executive function is to merely delineate it as something different than a judicial act—interpreting the law, or a legislative act—enacting a bill or a law. A typical example of how the courts have actually applied the use of the phrases "executive function" and "legislative function", which has been on occasion misapplied to the doctrine of separation of powers, is to be found in the case of *State v. Sims,* 141 W. Va. 302, 90 S. E. 2d 288 (1955). There the court construed a constitutional provision that when in an extraordinary or special session the legislature shall enter upon no business, except that business stated in the proclamation by which the special session was convened, and held that the phrase "no business" refers only to legislative business, and did not restrict the right of the senate at any such special session to conduct any of its administrative or executive functions, including the consideration of any recess appointments which might have been made by the governor.

If, as is contended, the doctrine of separation of powers prevents any invasion of the functions of one department by any other department, then many activities which are commonplace in government could not be performed, particularly with reference to filling vacancies in the office of judge. There is no interference with judicial power when the governor appoints a judge. When the governor appoints a judge, the appointment is not the exercise of a judicial but of an executive function, but this occurs within

the judicial department. If such contentions are correct, we would be driven to the conclusion that a vacancy in the office of a judge must be filled by some judicial body as an incident to the functioning of the judicial system. By the same token neither could the governor make an appointment to fill a vacancy in the legislative department, because again we would be driven to the conclusion that a vacancy in a seat in the legislature must be filled by some appropriate action of the legislature, without the exercise of any executive function of appointment by the governor. But as has been pointed out in *Van Sickle v. Shanahan,* supra, and *State, ex rel., v. Fadely,* supra, and the authority cited in those cases, we find many examples of the overlapping of functions primarily the exclusive responsibility of one department being exercised in part by another department.

Granting that the senate, in this case, *may* lawfully non-confirm and reject the appointment of the defendant by the governor, the next issue is *did* the senate *lawfully* non-confirm and reject the appointment of the defendant by the governor? The precise question which the parties were directed to brief is whether the defendant, Franklin Riddle Theis, was deprived of any constitutional right by the failure of the Kansas Senate to afford him a hearing.

A matter of concern is whether the due process provisions of the Fourteenth Amendment, which provide "nor shall any State deprive any person of life, liberty, or property, without due process of law", have been violated by the failure to provide a senate hearing. The due process ramifications are an evolving concept with much litigation. (*Perry v. Sindermann,* 408 U. S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 [1972]; *Board of Regents v. Roth,* 408 U. S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 [1972]; and *Arnett v. Kennedy,* 416 U. S. 134, 40 L. Ed. 2d 15, 94 S. Ct. 1633 [1974], *reh. denied,* 417 U. S. 977, 41 L. Ed. 2d 1148, 94 S. Ct. 3187 [1974].)

This court is compelled to the conclusion no due process violation is present because no property interest is involved, and any possible due process violation is a nonjusticiable political question.

Due process considerations mandate that when an interest involving life, liberty and property rights protected by the Fourteenth Amendment are implicated, the right to some kind of a prior hearing is paramount. (*Board of Regents v. Roth,* supra, at 569, 570; also, *Goldberg v. Kelly,* 397 U. S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 [1970].) But the range of interest protected by procedural due process is not infinite. This court must look to the

*nature* of the interest at stake. (*Morrissey v. Brewer,* 408 U. S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 [1972].)

Here the nature of the interest is the right to hold a public office. Can this be said to be encompassed within the terms "liberty" or "property"? We think not.

It is clear the concept of property is not and was not intended to remain static. (*Board of Regents v. Roth,* supra, at 571, [Procedural due process has extended well beyond actual ownership of real estate, chattels, or money]; *Bell v. Burson,* 402 U. S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586 [1971], [Driver's license]; *Goldberg v. Kelly,* supra, [Welfare benefits]; *Connell v. Higginbotham,* 403 U. S. 207, 29 L. Ed. 2d 418, 91 S. Ct. 1772 [1971], [Public employment]; and *Stanford v. Gas Service Company,* 346 F. Supp. 717, 729 [D. Kan. 1972], [Utility services].) A general guide was furnished by the *Roth* court which characterized the type of property interest encompassed within the due process clause as follows:

". . . To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. . . ." (p. 577.)

Clearly, it is only a *vested* right which cannot be taken away except by due process of law. (16 Am. Jur. 2d § 365, p. 694.)

Kansas law clearly establishes the incumbent to a public office enjoys no *property* or *vested interest* in public office. In *Lynch v. Chase,* 55 Kan. 367, 40 Pac. 666, a quo warranto action was brought to determine who was entitled to the office of state penitentiary warden. The court held:

"The office of warden of the state penitentiary is created for the public convenience, and the incumbent of the office is the mere agent of the public, who, by virtue of his appointment, acquires the right to exercise the functions of the office and receive the prescribed compensation until the end of his term, or until such time as there may be a resignation or forfeiture of and removal from the office in the manner provided by law; *but he had no property or vested right in such office.*" (Emphasis added.) (Syl. ¶ 1.)

In the opinion the court said:

" 'Officers are created for the administration of public affairs. When a person is inducted into an office he thereby becomes empowered to exercise its powers and to perform its duties, not for his, but for the public, benefit. It would be a misnomer and a perversion of terms to say that an incumbent owned an office or had any title to it.' . . ." (p. 372.)

*Goodrich v. Mitchell*, 68 Kan. 765, 75 Pac. 1034, involved the validity of the veterans' preference law between rival claimants for the office of superintendent of the Topeka electric-light plant. There the court in upholding the law said:

"The general doctrine is that, in the absence of constitutional limitations, the legislature may prescribe how and by whom offices shall be filled. *There is no contract right or property interest in an office,* and hence some of the constitutional principles invoked have no application. An office is a public agency, and an officer is a mere agent of the public, entitled to exercise the functions and perform the duties of the office for the public benefit and not for his own. The main consideration in the selection of officers and agents is the public welfare, and the state, like any other principal, may select its agents; may determine for itself who can best accomplish its purpose and whose appointment will best subserve the public good. . . ." (Emphasis added.) (p. 768.)

*"Office-holding is a political privilege, and the matter of appointment to office is not affected by the fourteenth amendment or other provision of the federal constitution,* and, as has been said, the power of the legislature is supreme in respect to appointments, save as the constitution has limited it. . . ." (Emphasis added.) (p. 772.)

Any contention that the defendant's position is within a protected property interest is without merit because the defendant holds office *subject to* senate rejection. (*Barrett v. Duff,* supra.) His status is more of a de facto officer and until confirmation the defendant has no possible property interest. Federal cases have recognized the distinction between probation and non-probation employees, (*Arnett v. Kennedy,* supra; and *Sampson v. Murray,* 415 U. S. 61, 39 L. Ed. 2d 166, 94 S. Ct. 937 [1974]); and between tenured and non-tenured school teachers, (*Board of Regents v. Roth,* supra). The defendant's interest is more of an expectancy of employment than any property interest.

The nature of the defendant's interest cannot be characterized as "liberty". Admittedly the concept of "liberty" must be broad. (*Bolling v. Sharpe,* 347 U. S. 497, 499, 500, 98 L. Ed. 884, 74 S. Ct. 693 [1954].) But to be deprived of "liberty" without due process involves damaging the defendant's standing and association in his community; damaging his good name, reputation, honor or integrity; or imposing on him a stigma or other disability that forecloses his freedom to take another job. (*Board of Regents v. Roth,* supra, at 573.) Here there is a stipulation that both parties are qualified. The governor and several senators indicated their rejection of defendant was not a reflection on his ability or integrity. We conclude there has been no deprivation of "liberty" here.

The defendant further contends this court can hear and decide the question whether he should have had a senate hearing before his rejection. He urges that senatorial consent, if required, presupposes an investigation. Defendant cities, *Barrett v. Duff*, supra, which states:

". . . The fact that the senate is called upon to consent to or confirm appointments presupposes an investigation upon which to base its judgment as to whether or not it should confirm or reject the named appointee. It is a matter of common knowledge that the senate of Kansas, likewise the senate of the United States, may, and frequently does, investigate the character, fitness and ability of the appointee submitted for its consideration. . . ." (p. 235.)

It is further urged that the defendant's removal without hearing suggests a lack of fitness. (*Wisconsin v. Constantineau*, 400 U. S. 433, 27 L. Ed. 2d 515, 91 S. Ct. 507 [1971].) The defendant argues an anomalous situation is created when the governor cannot remove except for cause, but the legislature can remove without a hearing. Despite the defendant's arguments this court is without authority to decide all of them.

Here the defendant's claim attacking the failure of the senate to conduct a hearing in rejecting his appointment presents a nonjusticiable political question. In *Baker v. Carr*, 369 U. S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962), the political question doctrine was extensively considered and explored. The opinion noted that the political question doctrine is based upon the doctrine of separation of powers and the relationship between the judiciary and the other branches or departments of government. The court identified and set forth six characteristics or elements one or more of which must exist to give rise to a political question. It said:

". . . Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." (p. 217.)

Under the general grant of legislative power to the legislature and the two provisions of the constitution heretofore discussed (Art. 2, § 18 and Art. 15, § 1), the legislature has the power to provide by law the manner of selection of all officers which might

not otherwise be provided for in the constitution. (*Sartin v. Snell,* supra.) Under these provisions there has been a "textually demonstrable constitutional commitment of the issue to a coordinate political department" of the Authority to provide for the manner of selection of all officers, and the manner of filling any vacancies for those positions which might not be otherwise provided in the constitution.

Article 2, § 8 of the Kansas Constitution in part provides:

". . . Each house shall elect its presiding officer and determine the rules of its proceedings. . . ."

Again there has been a constitutional commitment to the Kansas Legislature for each house of the legislature to be the sole judge of its procedure. For the court to involve itself in determining the advisability and wisdom of the senate's procedure would result in the court "expressing lack of the respect due coordinate branches of government."

The case of *International Harvester Company v. Kansas City,* 308 F. 2d 35 (10th Cir. 1962), was a sequel to the Kansas case of *State, ex rel., v. City of Kansas City,* 186 Kan. 190, 350 P. 2d 37, wherein this court had upheld the attorney general superseding a county attorney and then dismissing the action. The appellants contend they had no private remedy under Kansas law to contest the constitutionality of the annexation ordinances which were involved, and that this constituted a violation of due process under the Fourteenth Amendment of the United States Constitution. The federal court held that neither the due process clause nor the concept of equal protection is available to persons seeking to obstruct the ordinary and necessary exercise of the state's political functions. In the opinion the court said:

" 'We have nothing to do with the policy, wisdom, justice or fairness of the act under consideration; those questions are for the consideration of those to whom the State has entrusted its legislative power, and their determination of them is not subject to review or criticism by this court. . . .

" '. . . The power is in the state and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it.' Hunter v. Pittsburgh, 207 U. S. 161, 178, 28 S. Ct. 40, 45, 52 L. Ed. 151." (pp. 38, 39.)

The refusal of courts to interfere with legislative process is further demonstrated by *Sweitzer v. Territory of Oklahoma,* 5 Okla. 297, 47 Pac. 1094 (1897), where the court said:

". . . The failure of the legislature to properly weigh and consider an act, its passage through the legislature in a hasty manner, might be reason for the governor withholding his signature thereto, but this alone, even

though it is shown to be a violation of a rule which the legislature had made to govern its own proceedings, could be no reason for the courts refusing its enforcement after it was actually passed by a majority of each branch of the legislature, and duly signed by the governor.

"The courts cannot declare an act of the legislature void on account of non-compliance with rules of procedure made by itself to govern its deliberations. . . ." (pp. 299, 300.)

It has been held gubernatorial appointments may be *summarily rejected*. (*McChesney v. Sampson, Governor*, 232 Ky. 395, 23 S. W. 2d 584, 586 [1930].) A summary removal if authorized by statute, has also been accepted. *Gray v. McLendon*, 134 Ga. 224, 67 S. E. 859 (1910) involved the removal of a railroad commissioner under a law requiring legislative advice and consent in removal. The Georgia Supreme Court said:

"The office of railroad commissioner is not a constitutional office. It is one created by the General Assembly. The General Assembly in creating this office reserved the right to remove or restore any one filling it and suspended by the Governor . . . It is not required that they [the General Assembly] shall make any kind of investigation or inquiry, or shall have specified reasons for such restoration or removal; but in creating the office the right is reserved to declare the officer restored or removed by a majority of the House and Senate; and this may be done for any reason satisfactory to them. If the General Assembly, without any investigation, special findings, notice, or hearing, were to declare the suspended commissioner restored, would it be illegal? Certainly no investigation, special findings, notice, or hearing would be necessary before the General Assembly could restore a suspended commissioner. If such things are not necessary to restore, they are not necessary to remove. A majority of the members of the House and Senate can either restore or remove a suspended commissioner with or without notice to any one, or any investigation whatever, and without assigning any reason therefor." (pp. 239-240.)

The court concluded it was powerless to review the action of the governor in suspending, or the General Assembly in removing, McLendon.

We have indicated the various conditions, political party, sex, or occupation, the legislature may impose. Absent arbitrary classification it is not for this court to say they are unconstitutional. This court simply does not inquire into the motives of the legislature. (*Schumacher v. Rausch*, supra.)

Absent constitutional infringements our court does not examine the wisdom, justice or expediency of legislative actions. *City of Wichita v. White*, 205 Kan. 408, 469 P. 2d 287; *Republic Natural Gas Co. v. Axe*, 197 Kan. 91, 415 P. 2d 406 and *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 408 P. 2d 877.

In conclusion we hold there is no mandatory requirement for senate hearings because no property interest is involved, and inquiring into what type of senate hearing was or should have been given is a nonjusticiable political question.

Finally it is urged that statutes providing for senatorial consent to appointments made by the executive are unconstitutional because they deny the appointees the equal protection of the laws, when other appointments made by the executive do not require such senatorial consent for their validity. This court's recent decision in *Henry v. Bauder*, 213 Kan. 751, 518 P. 2d 362, and other cases do not support this position. Where the law operates equally upon all officers holding offices of a particular description, it is in no sense discriminatory in character. On the contrary, it is uniform in effect throughout the state and upon all persons of a given classification, here the Kansas adult authority. (*Gray v. McLendon*, supra at 243; and *People v. Barry*, 53 Mich. App. 670, 220 N. W. 2d 39 [1974].) As heretofore indicated the wisdom of those classifications is for the legislature.

Judgment is for the plaintiff as heretofore entered by this court on June 3, 1975.

FROMME, J., not participating.

Pursuant to Article 3, section 6 (*f*) of the Constitution of the State of Kansas, the Honorable Frank R. Gray, judge of the district court of the 7th Judicial District was assigned by the Chief Justice to participate in this court's decision in the foregoing case, *vice* Fromme, J.